# Lehigh Valley Coal Company *versus* Jones.

1. In order that workmen should be fellow-servants within the meaning of the rule that a master is not responsible to a servant for an injury caused by his fellow-servant, it is not necessary that the workman causing and the workman sustaining the injury should both be engaged in the same particular work.  It is sufficient if they are in the employment of the same master, engaged in the same common work, and performing duties and services for the same general purposes.  And the rule is the same, although the one injured may be an inferior in grade and subject to the control and direction of the superior whose act caused the injury, providing they were both co-operating to effect the same common object.

2. A " mining boss" and a " driver boss," are such fellow-servants, and where the death of the latter is caused by the negligence of the former, the owner of the mine is not responsible.

3. To prove contributory negligence, it is competent to show that the deceased was warned to avoid the place where he was killed, and that he himself had conveyed this warning to others.

4. Mullan v. Steamship Co., 25 P. F. Smith 25, explained.

March 15th 1878.　　Before Agnew, C. J., Sharswood, Mercur, Gordon, Paxson, Woodward and Trunkey, JJ.

Error to the Court of Common Pleas of *Luzerne county :* Of January Term 1878, No. 242.

Case by Gilbert Jones against the Luzerne Coal and Iron Company, to recover damages for the death of his son, which, it was alleged, was caused by the negligence of defendants.　Plea, " Not guilty."

It appeared that on the 12th of February 1876, an explosion took place in a mine of the defendants, known as the Exeter Shaft, wherein four men were killed, among whom was the plaintiff's son. The mine had all the machinery and appliances necessary for ventilation required by the Mine Ventilation Act of 1870.　The engines and fan were capable of throwing into, or rather drawing through the mine, one hundred and twenty thousand cubic feet of air per minute.　The method of ventilation, in general use in the Wyoming coal fields, and, indeed, throughout the entire anthracite region, is by sucking or drawing the air from some distant inlet into the mine, called a " down-cast," through the mine, and thence up and out by what is called the " up-cast," which is near the shaft.　This system requires that the currents of air shall be carried against the parts of the mine being worked, the " workings" specified in the Ventilation Act.　This results in separating the worked out part of the mine from the part being operated ; the direct currents being thrown against the breasts being worked, and the old or worked chambers and gangways being ventilated by the general suction of air through the whole mine.　In order to conduct these currents of air, and to shut off certain of those parts of the mine which have been worked, doors are erected at intervals, and the several openings (from one gangway or chamber to another), closed, so far as the current thus artificially created is concerned.　The Mining Ventilation Act expressly requires that these doors shall be double, that is, two doors at a sufficient distance.　There being a suspension of work throughout the coal region, all general work in the mine had been stopped, and the men, numbering nearly three hundred, discharged, until operations could be resumed.　Only thirty men were retained, and they were set to work to build an air bridge, widen a gangway, and make such repairs as could not be effected whilst the mines were in full operation.　All of these men were working near the foot of the shaft, and near the current of air.　Complaints were made by the men to the mine boss, Reese,

that it was difficult, and, in fact, almost impossible, to work, by reason of the immense volume of air passing them. The fan was then slowed down from about sixty to forty-two revolutions per minute. The witness examined on this point, an expert, familiar with this mine, testified that thirty-five to forty revolutions per minute were sufficient to ventilate the whole mine with all the men working. As a measure of precaution, however, Reese, the mine boss, warned the men not to go through any doors, or off the main gangways. This warning was repeated daily, and was communi- cated to Alex. Jones, who was then employed as a driver boss, and who repeated it, as he had been ordered to do, to several workmen, whom he happened to see on the morning of the accident.

After the explosion the body of Jones was found in a side chamber, inside of a door shutting off that gangway from the one in which the men were at work, and a few hundred feet from them. The fact that his body was burned and that none of the other men employed were burned, would seem to indicate that his lamp had occasioned the explosion. The body was found by the side of some empty cars, which were also burned. Jones was "driver boss," whose duty it was to keep the miners supplied with empty cars.

The superintendent of the colliery testified that he had the gen- eral control of the management thereof; that Col. Mason was the "outside foreman," and Mr. Reese the "inside foreman" of the Exeter Shaft; that the duties of Col. Mason were to take charge of the coal when it came from the mines and to have the super- vision of the breakers, engineers and outside men. Mr. Reese was also called the "mining boss." He had entire control of the inside operations in regard to the workingmen employed and the ventilation, subject to orders from the general superintendent. Harris was an assistant under him. Davis was the "fire boss," whose duty it was to go down into the mine every morning before the men began their work, to ascertain the condition of the mine and the quantity of gas therein. Jones, as before stated, was the "driver boss."

At the trial before Stanton, J., the defendant offered to prove by a witness on the stand, that on the Wednesday preceding the Saturday of the accident (witness then working in the shaft), the deceased told the witness not to go off from the mine gangways or through any door. The court sustained the objection to this offer and sealed an exception.

This was the twelfth assignment of error.

The following points were submitted by plaintiff, to which are subjoined the answers of the court:

1st. If the jury believe that A. Reese had entire charge of the mining and ventilation of this shaft, and that A. G. Mason had entire charge of the machinery and engines, and that by the orders

[Lehigh Valley Coal Co. *v*. Jones.]

of both Reese and Mason the revolution of the fan was slowed to an unsafe degree, and that the deceased lost his life in consequence while in the ordinary discharge of his duty, then the verdict should be for the plaintiff.

Ans. "This point we affirm."

2d. If the jury believe that the accident in question occurred to the deceased while in the ordinary discharge of his duty, through the negligence and want of due care on the part of the defendant, who had control of the mining and ventilation of the shaft and colliery, then the verdict should be for the plaintiff.

Ans. "To this we say your verdict should be for the plaintiff if you find that there was not contributory negligence on the part of Alexander Jones."

The defendants asked the court to charge "that under all the evidence in the case the plaintiffs cannot recover," which was refused. This was the eleventh assignment.

In the general charge the court, inter alia, said:—

"When a company or an individual gives over to an agent all or any part of his business to perform, and leaves the exclusive control of it and all the discretion pertaining thereto in the hands of said agent, anything that results from the negligent performance of such duties, the company is to be held answerable for. Taking in this case Colonel Mason, Mr. Reese, Mr. Davis and the gentleman who was killed, Thomas Harris, they were the company's agents in this case, and for any act of negligence on their part in the line of duty assigned to them, the company is to be held responsible by you."

This portion of the charge was the fourth assignment.

The court further said:—

"According to the testimony on the part of the plaintiff, Jones was a careful, industrious and diligent young man. [According to that testimony he was very much afraid of explosions of gas.] About two o'clock of the afternoon of that day, according to this evidence, an explosion of gas occurred in the mine and he was killed thereby. [Now if you find that he was simply performing his duty there, that he was then in the line of his duty, and that this explosion on account of the negligence of the defendant, then Gilbert Jones is entitled to damages for the life, or rather for whatever he has lost, by the death of his son.]

The foregoing portions of the charge in brackets, constituted respectively, the fifth and sixth assignments. The verdict was for plaintiff for $3600. The defendants took this writ, the assignments of error, inter alia, being those above noted.

*J. Vaughan Darling*, *Samuel Dickson* and *Henry M. Hoyt*, for plaintiffs in error.—If the proposition embraced by the fourth assignment is law, it becomes practically impossible for any corporation

or individual, to conduct any business of a character which requires the employment of other persons in any capacity other than that of common workmen.

The court below instructed the jury, as matter of law, that the outside superintendent, the inside superintendent, the mine boss, and the fire boss were all principals, and that any act of negligence on their part, by which one of the company's employees was injured, bound the company.

The charge is not sustained by Mullan v. Steamship Company, 28 P. F. Smith 251, on which it assumes to rest. All that case decides is that, under all the evidence, it was a question of fact for the jury to say whether the defendants had not conferred on the superintendent "such unlimited authority as to make him their representative, and to make themselves responsible for his default."

Mason, Reese and Jones, were all fellow-servants, and the fact that there was a distinction in the grade of the services makes no difference. It is not necessary that there should be privity of service to apply the rule that the master is not responsible for an injury by a fellow-servant: Gallagher v. Piper, 16 C. B. N. S. 669; Feltham v. England, L. R. 2 Q. B. 33; Searle v. Lindsay, 11 C. B. N. S. 429; Hall v. Johnson, 3 H. & C. 589; Innocent v. Peto, 4 F. & F. 8; Albro v. Canal Company, 6 Cushing 75; Ryan v. Railroad Co., 11 Harris 384; Frazier v. Railroad Co., 2 Wright 104; O'Donnell v. Railroad Co., 14 Wright 490; Caldwell v. Brown, 3 P. F. Smith 453; Meyer v. Railroad Co., 5 Id. 460; Ardesco Railroad Co., 13 Id. 146; Patterson v. Railroad Co., 26 Id. 389. The true rule as to the duties and liabilities of the master towards the servant was arrived at in the English case of Wilson v. Merry, L. R., 1 H. L. Scotch App. Cas. 326; see also Morgan v. The Vale of Neath Railroad Co., L. R., Q. B. 149; Howells et al. v. Landore Simons Steel Co., L. R., 10 Q. B. 62. See also the following cases as to what constitutes fellow-servants: Farnwell v. Railroad Co., 4 Metc. 49; Bartonshill Coal Co. v. Reid, 3 Macq. S. C. App. 295.

*Charles E. Rice* and *Alexander Farnham*, for defendant in error.—Many of the authorities cited by the plaintiff in error, as bearing on the fourth assignment of error, are irrelevant, as we do not dispute the doctrine of non-liability for the acts or negligence of a fellow-servant. We deem the remarks of the court in reference to Colonel Mason, Thomas Harris and Edward Davis as unessential, and as not having tended to influence the jury in their deliberations upon the verdict. It was nowhere claimed that Davis or Harris were the parties causing the injury. Even with this statement from the court, if the jury found, agreeably to our points, that A. Reese had entire charge of the mining and ventilation, and that the accident resulted from the negligence of the agent or agents

of the defendants, the verdict must be sustained, for there can be no doubt as to Reese's functions, nor that his deliberate act caused the injury.

The point upon which the case of Wilson v. Merry, *supra*, turns arises from the view there taken of the nature of the master's duty and the workman's implied bargain. This view, it is needless to say, is essentially different from that which has obtained here and elsewhere in this country, as well as in Scotland, and in several of the English cases. It was there held by Lord Cairnes, that in the event of the master not personally superintending and directing the work, he is bound simply "to select proper and competent persons to do so, and to furnish them with adequate materials and resources for the work," and that "when he has done this he has done all that he is bound to do;" and further, that "if the persons so selected are guilty of negligence this is not the negligence of the master."

*Here*, the master's duty is to cause no injury to the workman by his negligence, or by that of his superintendent or middle-man.

*There*, his duty is, likewise, when managing for himself, to avoid causing injury, by his negligence, to the workman; but if he leaves his business to be managed by others, then his duty is simply to employ a person supposed to be "proper and competent," to manage for him, at which his responsibility ends.

The same distinction is to be observed with respect to the risks the servant is assumed to have taken.

*Here*, leaving out of view the mechanical and natural risks, he is assumed as having taken the risk of negligence by his fellow-servants, but not the risks arising from the negligence of the master, or his middle-man when the master is not personally superintending the business.

*There*, he is regarded as agreeing not only to the risk of negligence in fellow-servants, but also to the risk of negligence in the middle-man, or deputy-master, although this personage may be invested with unlimited scope of function and duty in the conduct of the business and in the management of its several methods. That these distinctions are radical is evident. Can there be any doubt that a corporation may be liable to its own servants for negligence? that it can be no more exempt in this respect than an individual? But how can the negligence of a corporation be shown except by the conduct of those whose will alone must be the will of the corporation, and whose acts are the acts of the corporation, viz.: its managers and middle-men? Such is the rule in this state: see Frazier v. Penna. Railroad Co., *supra*; Ardesco Oil Co. v. Gibson, *supra*; Patterson v. Pittsburgh and Connellsville Railroad Co. 26 Smith 389; Huntington and Broadtop Railroad Co. v. Decker, 1 Norris 119; 3 Id. 419.

[Lehigh Valley Coal Co. *v.* Jones.]

Mr. ·Justice MERCUR delivered the opinion of the court, May 6th 1878.

This suit was brought by defendant in error to recover damages for the death of his son, Alexander Jones. He was killed by an explosion of gas, in the colliery of the plaintiff in error, known as the "Exeter Shaft," and while in the employ of the company. It is claimed that the explosion was caused by an insufficient supply of fresh air.

This mine was ventilated by the method usually practised in the coal fields of Wyoming. It is by drawing the air through an inlet called a "down-cast" into the mine, and having passed it through the mine, then up and out by what is called the "up-cast," which is near the shaft. The movement of the air is effected by means of a "suction-fan." It creates a vacuum, and that vacuum is filled by the natural pressure of the atmosphere, thereby creating a continuous current. A current of fresh air is thus drawn in, and thrown out, and the gas passes out with it. The fan is a wheel of about twenty feet in diameter, having paddles thereon of about six feet in width. Its effectiveness depends on the rapidity of its revolution. The quantity of fresh air necessary to be passed through the mine depends on the number of men employed therein. The 7th section of the Act of 3d March 1870, Purd. Dig. 1069, pl. 7, declares that in every mine or colliery, an adequate amount of ventilation shall be provided, "of not less than fifty-five cubic feet per second of pure air, or thirty-three hundred feet per minute, for every fifty men at work in such mine, and as much more as circumstances may require." The defendant in error proved by James Bryden, that the fan in use at the time of this accident, was of sufficient capacity, when driven, to thoroughly ventilate the mine, and that from thirty-five to forty revolutions a minute would secure perfect ventilation, also that at about forty revolutions a minute, the cubic contents of the ventilation, would be about sixty thousand feet per minute. At the time of the accident there were only twenty-nine or thirty men at work in the mines. Hence the ventilation at forty revolutions per minute, would be thirty times greater than the statute required. No witness testified that the fan was either defective in construction, or insufficient in capacity to properly ventilate the mine. The complaint was that the revolution of the fan was so lessened, that it did not remove the noxious gases, and the explosion therefore resulted. It appears that some days prior to the explosion, all general work in the mine had been stopped. Most of the three hundred persons or thereabouts, who had been at work, were discharged. Some thirty only were retained. They were engaged in making some improvements and repairs in the mine, which could not well be done when it was in full operation. Alexander Jones was one of these men. They were at work near the foot of the shaft, and so near the current of air as to be annoyed

thereby. They complained to Mr. Reese, the "mine boss," that this large volume of air made it difficult for them to work. At their request the fan was "slowed down." The natural effect of this would be to check the removal of the carburetted hydrogen, and therefore to permit more of it to remain in the mine.

Jones's body was found in a side chamber, inside of a door shutting off that gangway from the one in which the men were at work, and a few hundred feet from them. Whether any duty called him into that gangway does not clearly appear. The marks of burning found on his person would indicate that his lamp caused the explosion; but the jury has found that he was not guilty of any contributory negligence. The main question now presented for our consideration is whether there was any evidence of negligence for which the plaintiff in error is liable? It is claimed that the negligence, if any, was that of Jones's fellow-servants, for which the company is not liable.

It is well settled in England, and in Pennsylvania, and pretty generally in this country, that a servant who is injured by the negligence or misconduct of a fellow-servant, cannot maintain an action against the master for such injury. If, however, there be fault in the selection of the other servant, or in retaining him in his place, after he has proved incompetent, or in employing unsafe machinery, the master may be liable. So, if the master has placed the entire charge of the business in the hands of an agent, exercising no authority and no superintendence of his own therein, he may be liable for the negligence of such an agent, to a subordinate employee. This rule of liability for the negligence of a general agent applies whether the master be an individual or a corporation. Owing to the fact that the business of corporations is transacted by means of agents, they would escape the just measure of liability unless this rule applied to them. In this respect, both as to liability and for protection, they stand on the same footing with individuals.

The question arises who are fellow-servants in contemplation of law? To constitute such they need not at the time be engaged in the same particular work. It is sufficient if they are in the employment of the same master, engaged in the same common work, and performing duties and services for the same general purposes. The rule is the same, although the one injured may be inferior in grade, and is subject to the control and direction of the superior, whose act caused the injury, provided they are both co-operating to effect the same common object. The true reason upon which, I think, this rule rests is, that each one who enters the service of another, takes on himself all the ordinary risks of the employment in which he engages, and that the negligent acts of his fellow-workmen, in the general course of his employment, are within the ordinary risks. Omitting numerous cases which sustain the principle

we have stated we will content ourselves with citing Wilson v. Merry, Eng. Law Rep., 1 H. L. Scotch Ca. 326; Hall v. Johnson, 34 L. J. Exch. 222; Morgan v. The Vale of Neath Railway Co., 35 L. J. Q. B. 23; Howells v. Landore Simons Steel Co., 10 Eng. Law Rep. (Q. B.) 62; Albro v. Canal Co., 6 Cush. 75; Gillshannon v. Stony Brook Railroad Cor., 10 Id. 228; Gilman v. Eastern Railroad Co., 10 Allen 233; Russell v. Hudson Railroad.Co., 17 N. Y. 134; Boldt v. New York Central Railroad Co., 18 Id. 432; Wright v. Same, 25 Id. 562; Fort v. Railroad, 2 Dillon 259; Chicago & A. Railroad v. Murphy, 53 Ill. 336; Wonder v. B. & O. Railroad Co., 32 Md. 411; Ryan v. Cumberland Val. Railroad Co., 11 Harris 384; Frazier v. Penna. Railroad Co., 2 Wright 104; Caldwell v. Brown, 3 P. F. Smith 453; Weger v. Penna. Railroad Co., 5 Id. 460; Ardesco Oil Co. v. Gibson, 13 Id. 146; Patterson v. Pitts. & Connells. Railroad Co., 26 Id. 389; Mullan v. Phila. & South. Mail Steamship Co., 28 Id. 25.

In part of the charge covered by the fourth assignment, the learned judge said to the jury, "that Colonel Mason, Mr. Reese, Mr. Davis and Thomas Harris were the company's agents in this case, and for any act of negligence on their part in the line of duty assigned to them, the company is to be held responsible by you." The question then is, did the evidence show that these persons, or either of them, sustained such relation towards the plaintiff in error as to make it liable for their misconduct? The company had one general superintendent over all these men. He was one of the witnesses called and sworn in behalf of the defendant in error. He testified that he was superintendent of all its collieries in the neighborhood; that he had the general control of the management of all those collieries; that Col. Mason was the "outside foreman" and Mr. Reese the "inside foreman" of the Exeter Shaft; that the duties of Col. Mason were to take charge of the coal when it came out; that he had charge of the brakers, engineers, all outside men—but was not superintendent of the inside work. It appears that Mr. Reese, called by the general superintendent "inside foreman," was also known as the "mining boss.". He had the entire control of the inside operations, in regard to working men employed, and the ventilation, subject to orders from the general superintendent. The 8th section of the Act of 3d of March, *supra*, requires the employment of a mining boss, who shall keep a careful watch over the ventilating apparatus, and all things connected with and appertaining to the safety of the men at work in the mine. Presumably these duties were assumed by him. Harris was an assistant under him, and to a considerable extent performed the duties of a mining boss. Mr. Davis was the "fire boss." His duties were to go down the shaft every morning, before the men went to work, and to ascertain whether there was any gas, and report to the men before they went down. Lines was the

engineer in charge of the fan and pump engine.    He had control of the revolutions of the fan, under instructions from Col. Mason and Reese, and by their orders he "slowed down" the fan a few days prior to the explosion.    Alexander Jones was the "driver boss." His business was to get cars for those needing them, and to see that the drivers properly discharged their duties in moving the coal.

Thus it is shown that the foreman and bosses and their assistants, including the engineer, miners and drivers, whether at work inside or outside of the mine, were all engaged in the same common work, and performing duties and services to effect the same general object —that purpose, and that object was, to take the coal from its natural bed, lift it to the surface and prepare it for market.    It is true each had his alloted work to perform, yet, nevertheless, they were all fellow-servants or fellow-workmen, seeking to reach the one common object, and accomplish the one common purpose.    Some of the employees were superior in the grade of their employment to Alex. Jones, others were inferior.    Whether superior or inferior they as well as he, were all under one common superintendent.    In his hands, and in his alone was the entire charge of the business placed by the company.    His negligence might be negligence of the company.    In this case no negligence is imputed to him, either in the selection or retention of unworthy employees, nor in using unsafe machinery.    It therefore follows that the learned judge erred in charging that the company was liable for the negligence of certain of its foremen and bosses, which resulted in the death of another boss.    The latter took on himself that risk, as a part of the ordinary risk of his employment, when he became engaged in the same common service with them.    Under the most careful management, mining is attended with danger, and persons engaging therein must be presumed to knowingly incur the ordinary risks incident thereto. Nor do we think the liability of the company for the act of its mining boss is changed by the fact that he is appointed pursuant to a statute, where it has a general superintendent over him, who has power to direct and control him.    We discover no sound reason for any distinction.    In either case the company must appoint a competent and suitable person, and provide suitable and safe machinery. He is to "carefully watch" and "to see" for the purpose of protecting from danger, all men at work in the mines, says the statute. This, however, does not displace nor supersede his superior, to whom he may be required to report.    Howell v. Landore Simons Steel Co., *supra*.

The conclusion we have reached is not in conflict with the law of Mullan v. Philadelphia and Southern Mail Steamship Co., 28 P. F. Smith 25.    The facts show that to be a close case; it is very near the dividing line.    Yet we thought the evidence sufficient to go to the jury under proper instructions.    As stated in the opinion of our brother WOODWARD, there was some evidence tending to

[Lehigh Valley Coal Co. *v.* Jones.]

establish that the chief stevedore, whose negligence was alleged to have caused the injury, was clothed with the ultimate power and authority of the Steamship Company. It was further said the jury should ascertain to what extent the plaintiff and the chief stevedore were engaged in a common employment; yet it was expressly said " it is not designed in any way to impair or affect the rule settled in the cases, on which the court below relied." Hence that case was not intended to overrule, nor did it profess to, any of the numerous decisions which have so clearly settled the law against the right of an employee to maintain an action against his master for the negligence of his fellow-workmen.

We think the learned judge erred in excluding the evidence covered by the twelfth assignment. It bore directly on the question of Jones's negligence in entering the gangway in which his body was found. The point submitted by the plaintiff in error should have been affirmed. The fourth, sixth, eleventh and twelfth assignments are sustained. We cannot say there is any substantial error in the .other assignments.

Judgment reversed.