T. M. Mitchell, Appellant, v. D. S. Stewart, Attorney in Fact for Elizabeth Stewart, J. C. Work, Administrator d. b. n. c. t. a. of Elizabeth Stewart, deceased, and Anna H. Stewart, Administratrix of D. S. Stewart, deceased.

*Negligence—Contributory negligence—Explosion of gasoline from lighted lamp—Evidence.*

In an action to recover damages for personal injuries caused by the explosion of gasoline, plaintiff is properly nonsuited because of contributory negligence, where it appears from his own testimony that he entered a cellar with a lighted lamp; that he knew at the time he entered that the gas apparatus was out of order; that he had been warned and instructed previously not to turn on the gas until the pipes were fixed; that he had also been informed by a book of instructions that it was dangerous to approach the gas vault with a light, and that the generator should never be filled with gas except by daylight.

Argued May 10, 1898. Appeal, No. 147, Jan. T., 1898, by plaintiff, from order of C. P. Fayette Co., June T., 1892, No. 386, refusing to take off nonsuit. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Affirmed.

Trespass to recover damages for personal injuries.

The facts appear by the opinion of the court below and of the Supreme Court.

At the trial the court entered a compulsory nonsuit, which it subsequently refused to take off, MESTREZAT, J., filing an opinion in part as follows :

This application is to strike off the non-suit. The following appear to be the facts, as disclosed by the testimony at the trial: The defendant leased to William P. Jackson two hotel properties, known as the " Ohiopyle house " and the " Fern Cliff Park hotel," at the village of Ohiopyle, in Stewart township. The lease began on April 1, 1891, and was to expire January 1, 1892. This lease was made with the understanding with the defendant that T. M. Mitchell, son-in-law of Jackson, was to take the Fern Cliff Park hotel and pay the rent to the defendant. In the latter part of April, 1891, Mitchell, with his ser-

vants, commenced to clean and put the hotel in condition for
occupancy, and during that time stayed there at night.   The
second week of May following he moved into the hotel.   The
Fern Cliff Park hotel was lighted by a gas plant that had been
placed there about ten years prior to the accident by which the
plaintiff was injured.   The gas was manufactured from gaso-
line.   For safety, the generator had been placed about one hun-
dred feet from the building.   The gas was conducted to the
house through a pipe which entered the cellar through the wall
and about two or three feet below the floor.   Inside the cellar
there was a joint in the pipe quite near the wall.   In the cellar
was an air pump, a part of the gas apparatus, to which a large
weight was attached, which was required to be kept wound up.
When wound it would run not quite one night.   The cellar
was sixteen by twenty feet, was dark, had no windows or out-
side doors, and was entered only from the kitchen by a stairway
leading down therefrom.   It contained the air pump and gas
pipes and nothing else.   Prior to this accident the plaintiff
had resided at Ohiopyle, or in the vicinity thereof, about all
his life.   He was familiar with the hotel, had been there often
before he took possession of it and knew how it was lighted
and the means of producing the gas for that purpose.   During
the time that he was cleaning up the property, preparatory to
removing, he was in the cellar several times putting it in shape.
On the second or third of May, 1891, Mr. Pinnard a plumber,
and the plaintiff went into the cellar and examined the gas
apparatus.   Pinnard told the plaintiff the gas pipes looked bad
and he had better have them fixed and not to turn on the gas un-
til they were tested.   This was communicated to Stewart by
Pinnard and Mitchell.   The plaintiff also told Stewart that the
water pipes through the house were frozen and leaking and
that the gas pipe and weight that forced the air through the
generator were broken down and the pipe leaked.   Stewart
said he would have them fixed.   This conversation took place
when the plaintiff told Stewart what the plumber had said, and
after the plaintiff had removed to the house.

Two or three times the plaintiff made attempts to light the
house, but each time the lights would rise and fall, indicating
something wrong with the gas apparatus.   The plaintiff thought
there was something wrong with the gas pipes, and that "it was

dangerous." He called Stewart's attention to this action of the gas on the morning of May 29, and Stewart said he would have it fixed, that there was nothing wrong with the pipes, and that the action of the gas was caused by air in the pipes. At that time, Stewart told the plaintiff to get the "book of instructions" and it would teach him how to work the gas apparatus. The plaintiff got the book and read it. Among the "cautions" in this book which the plaintiff read were the following: "It is dangerous to approach the gas vault with a light. Never fill the gas generator except during daylight and do not approach with a light while filling." About 9 o'clock on the evening of May 29, 1891, Mr. Liston, who was assisting the plaintiff about the hotel, went to the cellar and wound up the gas weight. The gas was then turned on, but it gave the same unsteady, flickering light as on prior occasions when the plaintiff had attempted to use it. Between 10:30 and 11 o'clock, the plaintiff with a common tin lantern, lighted and burning oil, started for the cellar "to wind the generator up," as he supposed it had run down and thereby caused the trouble with the gas. He had descended only to the second step on the stairway leading to the cellar when he smelt the gas and saw it on fire. An explosion followed immediately by which the plaintiff was badly injured and the hotel was damaged.

After the accident, the defendant called to see the plaintiff. The first time was the morning after the explosion and at the plaintiff's room. Stewart then told the plaintiff that the explosion was not his fault, but was Stewart's. On the Monday following the accident, Stewart saw the plaintiff again and said to him that he would make everything all right, that it was his negligence and that he "had neglected it too long. . . ."

Five or six weeks after the accident an investigation was being made in the cellar by Stewart, Mitchell and Jackson to ascertain the cause of the explosion, and a leak was discovered in a joint of the gas pipe, next to the wall. This is presumed to have been the cause of the explosion, but the evidence does not show that, prior to this discovery, Mr. Stewart knew of this defect in the pipe. But the evidence does disclose the fact that Mitchell knew as much, if not more, about the condition of the gas pipes in the cellar than Stewart did. . . .

The evidence shows no negligence on the part of the defend-

ant. His agreement did not require him to repair, and hence the injuries received by the plaintiff by reason of the defective gas pipes do not convict him of negligence. That the defendant thought and said that his negligence caused the plaintiff's injuries is not sufficient to impose responsibility, when the facts on which he based this opinion and which are disclosed by the evidence clearly show no legal liability. On the other hand, the plaintiff was guilty of contributory negligence. That fact indisputably appears from his own evidence. . . . The " caution " he read in the " book of instructions " the day preceding the evening of the explosion, warned him that it was dangerous to approach the gas vault with a light, and that he must not approach the generator with a light while it was being filled. Yet with these admonitions and with the knowledge that the gas was explosive and dangerous, he walked into the cellar, known by him to be close and containing the gas pipes and air pump, with a lighted lantern, and the moment he enters the explosion occurs. . . .

Stewart's parol agreement to fix or repair the gas pipes would not make the defendant responsible in this action. This agreement was made after the plaintiff had leased the premises and was occupying them. As the lease contained no contract to repair the premises, none can be implied, and any agreement for this purpose, entered into subsequent to the execution of the lease, would be nudum pactum, and would not avail the plaintiff here : Phillips v. Monges, 4 Whart. 226 ; Libbey v. Tolford, 48 Me. 316 ; Purcell v. English, 86 Ind. 34 ; Blake v. Dick, 15 Montana, 236. In the absence of an express warranty, fraud or misrepresentation, the lessor is not liable for injuries to the tenant for want of repairs : Brewster v. DeFremery, 33 Cal. 341 ; Doupe v. Genin, 45 N. Y. 119. Nor is the landlord liable for injuries to the tenant resulting from defective plumbing, where it is not shown that the plumber is not a competent workman : Meany v. Abbott, 6 Phila. 256. In the case at bar it does not appear that Stewart, at the time the lease was executed, tried to conceal any secret defects in the gas pipes, or knew the pipes were deficient in any respect and withheld that information from Mitchell. Hence, even if this were an action for deceit, there could be no recovery : Keates v. Earl of Cadogan, 10 Com. B. 591 ; Daly v. Wise, 132 N. Y. 306.

Under the pleadings and evidence in this case, we are compelled to discharge this rule and to refuse to take off the nonsuit entered on the trial.

*Error assigned* was in refusing to take off nonsuit.

*Edward Campbell*, with him *R. P. Kennedy*, for appellant.

*R. E. Umbel*, with him *A. D. Boyd*, for appellee.

OPINION BY MR. JUSTICE GREEN, July 21, 1898:

There is but one question in this case, and that is whether the plaintiff was so manifestly guilty of contributory negligence as to make it the duty of the court below to direct a compulsory nonsuit. At the conclusion of the plaintiff's testimony, upon motion of defendant's counsel, the court granted a compulsory nonsuit, which, afterwards in an exhaustive and able opinion, they refused to take off.

The plaintiff received his injury by an explosion of gasoline in the cellar of his own leased house. He entered the cellar with a lighted lantern in his hand and the explosion instantly took place. Was this the result of an act of negligence on his part which caused his injury? The explosion resulted immediately and directly from the presence of the lighted lamp. The plaintiff was the one, only person who brought the lamp in contact with the explosive gas, and was, of course, the sole producing agent of the resulting explosion. Whether his act was culpably negligent depends chiefly upon his prior knowledge of the character and qualities of gasoline, the condition of the apparatus in the cellar, and the probable or possible presence of gas in the cellar. The full detail of the plaintiff's knowledge and acquaintance with the gasoline plant, its connections with the house, the manner of lighting the house, and the condition and situation of the pipes and apparatus in the cellar are set forth with much clearness and force in the opinion of the court below on the motion to take off the nonsuit, and therefore they do not need much repetition here. Substantially, they amount to this: the hotel had been lighted with gas made from gasoline for about ten years; the generator was placed about a hundred feet from the house and the

gas was conducted to the house through pipes which led through
the cellar wall about two feet below the floor; there was an
air pump in the cellar which required to be wound up every
night, as a part of the gas apparatus; the cellar was sixteen
by twenty feet, had no windows or outside doors, was dark
and contained the air pump and gas pipes and nothing else;
the plaintiff had always lived in the vicinity and knew well
how the hotel was lighted, and the means for producing the
gas for that purpose; while he was preparing to occupy the
hotel he was in the cellar several times putting it in shape.
The following extracts from the plaintiff's testimony will illus-
trate the extent of his knowledge of the situation: " Q. How
is that house lighted?    A. By gasoline.    Q. Is the gasoline
manufactured there?    A. Yes, sir.    Q. Where?    A. In the
tank.    The gasoline tank is below the house about, well I sup-
pose, 100 feet from the house as near as I can tell.    Q. What
other arrangements were connected with it?    A. Well, the
generator was in the cellar under the kitchen part. . . . Q. What
arrangement was there between the place where the gas was
manufactured, for conveying the gas from the place of manu-
facture into the cellar?    A. There was a pipe; there was one
pipe to bring the air into the tank and another for conveying
the gas into the house.    Q. What part of the cellar wall did
that come in at?    A.    In at the lower part.    Q. Did it run
on the floor or on the rafters?    A. That came in the cellar, I
suppose two or three feet from the joists. . . . Q. What seemed
to be the condition of these pipes, and did you speak to Mr.
Stewart of their condition?    A. Yes, sir; the water pipes were
all froze through the house and leaking; every pipe almost
through the house was leaking, and the gas pipe and weight
that forced air through the generator was broken down; it was
broken down and the pipes leaked bad; everything looked in
bad condition.    Q. Did you call Mr. Stewart's attention to
that?    A. Yes, sir.    Q. What did he say?    A. He said he
would attend to it and have it fixed."    After saying that a
plumber named Pinnard had been there to examine a gas ap-
paratus in the cellar, he described an occurrence on the even-
ing of May 28, which was the evening before the explosion.
" We had a birthday party for my father-in-law on the 28th,
Thursday May 28th, that was the first night that we had lighted

the gasoline.  We had put the gasoline in the tank the Sunday before and that was on Thursday night.  Q. How did the gas work?  A. Well the gas would raise up and then die down and pretty near go out, and then would raise up again, and just kept on that way.  I got afraid there was something wrong, and after supper we turned the light out, and then the next morning we went down to Mr. Stewart's office, I believe about nine o'clock, and told him the way the gas had acted, and that I was afraid there was something wrong and he said: 'I will have it fixed, attend to it.' . . . . and he told me to go in the office and get a cigar case and I would find a book of instructions in it, and he said, 'You get this book and study it and it will teach you how to work this.' . . . . I went to the office and got the book of instructions . . . . and I read it through. . . . . On Friday evening, the 29th, we lit the gas all through the house, for I was expecting a big crowd the next day from Pittsburg.  Q. When did you then next try the gas?  A. That evening.  Q. Well, sir, how did it act?  A. Just the same as it had done before.  It burned slowly and kept getting dimmer and dimmer until someone called my attention to it and said there was something the matter, and I told him I had seen Mr. Stewart and he said it was air in the pipes.  I went over the house about 11 o'clock . . . . and I had a lantern, and started to go into the cellar to wind the generator up, for I supposed it had run down, that is what he told me that the lights would die down if it was not wound up.  I started to go into the cellar and went through the kitchen from the dining-room about five or six feet and then turned down the stairs that went into the cellar. . . . I stood on the second step with my lantern just on a level with the floor.  I saw that the gas was on fire and shut my mouth tight, and I smelt the gas just as it took fire and then it throwed me over against the wall."

On cross-examination, after saying he thought there was something wrong with the gas, he was asked: " Q. You say you thought there was something wrong with the gas?  A. Yes, sir; something wrong with the pipes.  Q. Did you think it was dangerous?  A. Yes, sir.  Q. On the evening of the 28th of May?  A. Yes, sir.  Q. What did you do about it?  A. I put the lights out and then the next morning I went down to Mr. Stewart's office and told him about it.  Q. Then the next

evening, that was the evening of the 29th, was it? A. Yes, sir. Q. The evening the explosion occurred? A. Yes, sir. . . . . Q. Was there any indication that there was something wrong with the supply of gas? A. Yes, sir; with the supply." After saying that the plumber had been there three or four weeks before the explosion, he was asked: " Q. Did he go into the cellar? A. Yes, sir. Q. Were you in the cellar with him? A. Yes, sir. Q. Did you observe anything wrong then? A. Well he told me that they looked bad, and he says you had better have them fixed and had better not turn the gas on until you get them tested. . . . Q. He told you to have them tested before you turned the gas on? A. Yes, sir, he told me to see Mr. Stewart and get him to let him fix them. Q. I will ask you if they were fixed before the 28th? A. No, sir. Q. Did you know that? A. Yes, sir. Q. You knew up to the 28th there had been no repairs made? A. Yes, sir. Q. You knew that Mr. Stewart hadn't been in there or had no other person in there to repair them? A. Yes, sir. Q. You told Mr. Stewart when you went to see him the next morning of this rising and fluttering of the gas did you, and that it was not safe? A. Yes, sir. . . . Q. You got the book of instructions did you? A. Yes, sir. Q. Did you read it carefully? A. Yes, sir. Q. Clear through? A. Yes, sir; I think we read it pretty much clear through as near as I can tell. . . . Q. I suppose you read in this book of instructions where it says 'cautions' about how to proceed in regard to the gas? A. Yes, sir. Q. One caution reads, 'It is dangerous to approach the gas vault with a light. Never fill the gas generator except during daylight. In case there is a strong odor of gas escaping from the vault, it is evidence of a leak, either from the generator or pipes which should be stopped. Under these conditions it is unsafe to enter the vault. The gas has an especially pungent odor, and its almost immediate effect when inhaled is intoxicating: it will in a few minutes be stupifying and in a longer time be fatal to life.' Did you read that? A. I think so. Q. Again, 'Never fill the gas generator except during daylight, and do not approach with a light while filling. In case there is a strong odor of gas escaping from any of the pipes or their connections, it is evidence of a leak which should be stopped.' Did you read that? A. Yes, sir. . . . Q. You never asked Mr. Stewart to

have the pipes in the cellar fixed? A. I told him what the plumber said. Q. You knew they needed fixing? A. Yes, sir; I thought there was something wrong. Q. Did you tell Mr. Stewart that the plumber said they ought to be fixed? Q. Yes, sir, I told him they looked as if they needed fixing."

The witness then described the finding of a leak in the pipe some time after the explosion, on the side of the pipe next the wall, and it is perhaps a reasonable inference that the gas escaped into the cellar through that leak, and exploded the moment it came in contact with the light in the lantern carried by the plaintiff. From the foregoing testimony, all of which comes from the plaintiff and, of course, is entirely uncontradicted, several conclusions follow. (1) The plaintiff himself was the producing agent whose act caused the explosion. If it had not been for the lighted lamp which he carried, there would not have been any explosion. (2) There is not a particle of testimony to show that Stewart had the least knowledge of the existence of any leak or opening in the pipe. (3) The plaintiff had at least as good, and indeed better, opportunities for knowing the condition of the gas pipes and air pump in the cellar, than the defendant. (4) The plaintiff was warned by the plumber not to turn on the gas until the pipe was fixed. (5) The plaintiff admits several times that he thought there was something wrong with the pipe, and that it was in a dangerous condition. (6) He was also informed by the book of instructions that it was dangerous to approach the gas vault with a light, and the generator should never be filled with gas except by daylight. From all which he must have inferred as an ordinarily reasonable man that it would be most highly dangerous to enter a cellar in which there was, or might be, escaping gas, with a lighted lamp. (7) The plaintiff was admonished by the manner in which the gas burned that there was something the matter with the gas apparatus in the cellar, and as an ordinarily prudent person he should have scrupulously avoided any probability or possibility of an explosion, by the introduction of a lighted lamp into the cellar in such circumstances. (8) The plaintiff had personal knowledge that the machinery in the cellar for supplying light was in a defective condition, and believing, as he says he did, that it was in a dangerous condition, he became subject to a special duty of care before entering the cellar, and most particu-

larly so before entering it with a lighted lamp. This duty he neglected with obvious carelessness, and was therefore responsible for the results.

The case comes within different lines of decisions upon the subject of contributory negligence. Thus in Oil City Gas Co. v. Robinson, 99 Pa. 1, the plaintiff was a civil engineer who entered a street sewer with a lighted lantern and was injured by the explosion of gas escaping into the sewer from an adjacent gas pipe. We held that although the gas company was liable for the consequences of the leak in their pipes, yet the plaintiff was guilty of contributory negligence for entering the sewer with a lighted lantern if it was probable that the escaping gas might enter the sewer, as this was a result which he ought to have anticipated. We said, GORDON, J.: "If it was probable that gas escaping from the leak would find its way into the sewer in quantities sufficient to produce an explosion, he ought to have anticipated the result, and not entered the sewer with a lighted lamp. If he did so, under the conditions stated, he was guilty of such contributory negligence as ought to have prevented his recovery." In Coal Co. v. Jones, 86 Pa. 432, we held that to prove contributory negligence, evidence is admissible that the deceased at the time of the accident was in a position which he had been warned, and himself had warned others, to avoid as dangerous. In Russell v. Hutchinson, 15 W. N. C. 482, we held it was contributory negligence for a boy eighteen years of age to go into a known dangerous chamber to work, against the advice of his father, but at the solicitation of the pit boss, and we sustained a compulsory nonsuit for that reason. To the same effect is Fairview Coal Co. v. Biddle, 18 W. N. C. 108. In Township of Crescent v. Anderson, 114 Pa. 643, we held that one who knows, or by ordinary care may know, of a defect in a highway, and voluntarily undertakes to test it when it could be avoided, cannot recover against the municipal authorities for losses incurred through such defect. In Kibele v. City, 105 Pa. 41, which was an action to recover damages resulting from an explosion of gas escaping from a gas main in the streets and entering the plaintiff's house, we said: "If the plaintiff knew that illuminating gas was escaping from the main, and also knew that from it an explosion might reasonably be expected, it was his duty to have withdrawn from the

premises, or to have taken other precautions for his safety, until the leak could be discovered and stopped. He could not knowingly take upon himself such a risk as this, the risk of an explosion, and for its consequences charge the city."

These citations might be multiplied, and they might also embrace the class of decisions in which persons ·knowing of defects in machinery continue to use it, and are therefore deprived of the right to recover for damages resulting from the defects, but it is not necessary. This plaintiff admits that he knew of the defects in this gas apparatus in the cellar; that he considered it in a dangerous condition, and that he had been warned not to turn the gas on until the defects were repaired. Nevertheless he did knowingly what he was warned not to do, to wit: turn on the gas before the apparatus was repaired, and he did knowingly enter the cellar with a lighted lamp when he knew there was something wrong, without first ascertaining whether gas was escaping, and when he had been told by the plumber and the book of instructions not to approach with a lamp when gas was escaping.

We are clearly of opinion he was guilty of contributory negligence, and the learned court below was right in refusing to take off the nonsuit.

Judgment affirmed.