## FLORENCE & C. C. R. CO. v. WHIPPS et al.

(Circuit Court of Appeals, Eighth Circuit. May 1, 1905.)

No. 2,062.

1. MASTER AND SERVANT—RAILROADS—INJURIES TO SERVANTS—SAFE PLACE TO WORK.

Where plaintiff's intestate, a railroad employé, was ordered to assist at night in the removal of débris caused by a landslide from the side of a mountain into a cut, obstructing traffic, and was killed by a large rock, which fell down the mountain side into the cut, the railroad company was not liable for failure to provide plaintiff with a safe place to work.

2. SAME—INSPECTION—ASSUMED RISK.

The servants of the railroad company being bound without orders to enter on the work of clearing the tracks without waiting for inspection, plaintiff's decedent was not entitled to rely on the railroad company having made an inspection of the place, but assumed the risk of injury from the dangers incident thereto.

[Ed. Note.—Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

3. SAME—FELLOW SERVANTS.

Where plaintiff's intestate, his foreman, and defendant's roadmaster were all engaged in the common employment of removing débris, caused by a landslide over the track of defendant's railroad in a cut, such roadmaster and foreman were decedent's fellow servants, for whose negligence in inspecting the mountain side for other loose rock which was liable to fall defendant was not liable.

[Ed. Note.—Who are fellow servants, see notes to Northern Pac. R. Co. v. Smith, 8 C. C. A. 668; Flippen v. Kimball, 31 C. C. A. 286.]

In Error to the Circuit Court of the United States for the District of Colorado.

The railroad of plaintiff in error runs between the towns of Florence and Cripple Creek, Colo., a distance of about 40 miles, through a rough, mountainous country, having tunnels and frequent cuts on the mountain sides. Rains and stormy weather, liable to loosen earth and rocks on the sides of such cuts, had continued for several days up to about the middle of the afternoon of April 11, 1901, when a landslide of loosened rock came down from the mountain side into a "thorough cut" on section 5 of said railroad, about two miles north of Adelaide Station. The mountain side of this cut down which the slide of rock came was more than 30 feet in height, and nearly perpendicular; and the cut on the opposite side of the track was 10 feet high, or more. The rock which so came down filled the cut for about 30 feet in length, and to the depth of 6 to 8 feet, completely obstructing the passage of trains. John McGrath, the foreman of said section, with such men as he had, began soon after the work of clearing away this fallen rock; and other foremen from nearby sections came with their men to aid him. The conductor of a south bound freight train, which about 4 p. m. was stopped by the obstruction, walked on to Adelaide and telegraphed the occurrence to some managing officer; and about 5 p. m. Miles McGrath, the roadmaster and superintendent of bridges, then at Florence, upon the order of the trainmaster, prepared a work train of flat cars pushed by an engine, and, gathering the laborers of the railroad company along the line, including a gang of bridge workmen, one of whom was Charles H. Whipps, arrived at the obstruction about 8 p. m., pushed the flat cars up to the rock lying in the cut, and set the men to work. Some of them at the south end of the obstruction, and among them the said Whipps, were put to loading the fallen stone upon the flat cars for removal, and others set to work at the north end of the pile of rocks; and said Miles McGrath then assumed the direction of the work. Up to that time John McGrath, the foreman of that sec-

tion, had been in charge; and while it was still daylight a brakeman from said freight train called the attention of John McGrath to a crevice at the side of a rock on the mountain side of the cut, and expressed his opinion that it was dangerous; though the brakeman had no experience in such formations. What, if any, inspection of this rock wall on the mountain side of the cut was made by said John McGrath, who was an experienced section foreman on that railroad, where such rock cuts were numerous, does not appear. The conductor of said freight train had met Miles McGrath at Adelaide, and expressed his opinion that there was danger of falling rock at the cut. When Miles McGrath, with his men, reached the obstruction, it was very dark. The only lights available were lanterns, and such light as reached the north end of the work from the headlight of the freight engine, which light, because of a curve in the railroad, did not reach the south side of the work, and from a small bonfire, which was bright for only a few minutes. After Miles McGrath reached the obstruction, because of the darkness, no inspection of the rock in the mountain side of the cut to determine whether any of it was liable to fall could be made with the lights which were available; and several of the foremen went together to Miles McGrath, and one of them in presence of the others asked Miles McGrath if the place had been examined and was all right, whereupon John McGrath, who was also present, said in their hearing to Miles McGrath, "Yes, I examined it before dark, and it is all right." Upon hearing that statement the foremen all went to work with their men, and the work continued until about 9 p. m., when a large rock fell down from the mountain side of the cut at the south side of the work, killing said Charles H. Whipps and some others, and injuring still others of the workmen. The plaintiffs (defendants in error) are the father and mother of said Charles H. Whipps, and brought this action under the Colorado statute to recover the damages, not exceeding $5,000, which they allege they have sustained by the death of their said son, which they aver was caused by negligence attributable to the defendant in not ascertaining by proper inspection the dangerous condition of the cliff of rock on the mountain side of the cut, and not propping or supporting the wall so as to prevent rock from falling therefrom, not advising said Whipps of the dangerous character of the cut, and not providing sufficient lights to enable said Whipps to observe the unsafe conditions, and in failing to provide him a safe place in which to work. Verdict and judgment was for the plaintiffs.

Karl C. Schuyler (Henry M. Blackmer, on the brief), for plaintiff in error.

Joseph H. Maupin and Arthur H. McLain (George H. Wilkes, on the brief), for defendants in error.

Before SANBORN and HOOK, Circuit Judges, and LOCHREN, District Judge.

LOCHREN, District Judge, after stating the case as above, delivered the opinion of the court.

It is a general rule of law governing the relation of master and servant that it is the duty of the master to use ordinary care to furnish and maintain a reasonably safe place for the servant in which to perform his work. This rule as to "safe place" only applies to such place as the master constructs, prepares, or selects for such purpose. It has a very limited application to the erection of new buildings or structures, though it may apply to stagings and the like, supplied by the master; and does not render the master responsible for dangers which necessarily inhere in the work and are only to be guarded against by the care the servants themselves shall exercise in its performance. Such risks, including the risk of neg-

ligence on the part of fellow servants, are assumed by all who enter into the employment. In many cases of preparatory work to fit a place for its intended use, like the excavation along a mountain side of a cut for a railroad track, the work so prosecuted will make the place which was safe before dangerous to the servants, as their work progresses, from the liability of stone or earth to slide down the sides of the cuts so made by the same servants, who must be held to have assumed all such risks. So in the pulling down of structures, and in the removal of débris after some catastrophe or accident which has made the place unsafe and unfit for the use to which it has been devoted, and where the very object of the work is to clear away the wreckage and restore the place to a condition of safety and usefulness. If by such catastrophe a railroad used for the transportation of passengers, freight, and mails is obstructed, the removal of the obstruction is a necessity admitting of no delay, whether the exigency arises in the daytime or at night; and servants employed, who undertake and engage in such work, necessarily assume the incidental risks. Gulf, etc., Ry. v. Jackson, 65 Fed. 48, 12 C. C. A. 507; Minneapolis v. Lundin, 58 Fed. 525, 7 C. C. A. 344; Porter v. Silver Creek, etc., Coal Co., 84 Wis. 418, 423, 54 N. W. 1019; Colo. Coal & Iron Co. v. Lamb, 6 Colo. App. 255, 266, 40 Pac. 251; Carlson v. Railway (Or.) 28 Pac. 497. The fact that the exigency causes the work to be done in the darkness of night and with insufficient lights does not lessen the assumption of the risks of the servants. Gulf, etc., Ry. v. Jackson, 65 Fed. 48, 51, 12 C. C. A. 507. But the court (adopting one of plaintiffs' requests) instructed the jury as follows:

"I charge you that it became and was the duty of said defendant company and its roadmaster, supervisor, and agent, before ordering and directing said Whipps to work at the aforesaid place, to have examined and inspected, or caused to be examined or inspected, the place wherein said deceased was required to work; and if you find that the said defendant, disregarding its duty toward the said deceased, negligently or carelessly failed to inspect the said premises, or negligently or carelessly failed to sufficiently and safely prop or support the said embankment or wall or cliff of rock, so as to prevent the same from caving or falling, or in any other manner negligently or carelessly failed to provide a safe place for the said Whipps to work, or negligently or carelessly failed to see that the loose rock and earth overhead was secure from falling in and upon the said Whipps at the said point, and that the place where he was ordered and directed to work was an unsafe and dangerous place to work, and that by reason of the defendant's violation of its duties and its several duties the said deceased lost his life, the case may be for the plaintiff, in connection with the other evidence in the case."

This charge was duly excepted to, and is assigned as error. The exception must be sustained. The first rock slide occurred late in the afternoon, and wholly obstructed traffic on the railroad, making it the duty of the servants of the railroad near that place, without awaiting orders, to clear the tracks of the fallen rock as rapidly as was possible. There was no time to summon engineers to inspect the face of the cliff. Such slides were not infrequent on this railroad, and there was no evidence that such a precaution as propping or supporting the embankment, wall, or cliff of rock was practicable, or was ever taken or thought of by any one under such circum-

stances on that or any other railroad. It was a sudden disaster, causing a condition of the tracks which had to be repaired with speed. The defendant was not responsible for the catastrophe and wreckage which caused whatever danger there was in the situation; and under such circumstances the doctrine of "safe place" had no application. The place was not in a condition made or chosen by the defendant, but in such condition as the disaster had left it. It was the plain duty of the servants in such an exigency, without awaiting orders, to engage in and hurry the work of clearing the obstruction from the track, and incidentally to look after and guard their own safety while so engaged; and the servants at hand, under John McGrath, their foreman and fellow servant, engaged in that work at once, and other servants, with their foreman, as they learned of the disaster, joined them. John McGrath was a man of experience on that railroad, where such slides had occurred before, and with the others could, while the daylight remained, see the face of the cliff, and form a judgment as to whether it appeared to be dangerous or reasonably safe for himself and his fellow workmen. That his attention was given to this subject appears, but the extent of his inspection or examination does not appear. His attention was called by a brakeman, who had no knowledge or experience about such matters, to a crevice or fissure at the side of a rock in the cliff. But it appeared that such crevices or fissures were common in all such cliffs, of which there were very many along that railroad, and this one does not seem to have impressed him as dangerous; and he appears to have relied on his own judgment and experience in preference to the suggestion of a mere trainman. Miles McGrath, the roadmaster, was sent there by another subordinate official, with an engine and flat cars and such workmen as he could pick up on the way, to clear the rock from the track; arriving there after it had become very dark. The foreman of these men which he brought there came to him when about to begin work, and one of them (Mr. Owens) asked him if the place was all right, whereupon John McGrath, who was present, answered, "Yes, I examined it before dark, and it is all right," and then the foremen went to work with their men.

It does not appear by direct testimony what information was given to Whipps, as to the exigency requiring this work to be done at night, or as to the character of the disaster, before he arrived at the obstruction and engaged in the work. It does appear that Miles McGrath arrived at Russell, where the bridge gang was, of whom Whipps was one, about 6 o'clock, with his engine and flat cars; and waited while they got their suppers, after directing that they go with him to this work; and that they got their shovels and went on those cars 10 miles or more to the work. If it is not a certain presumption that all the men were informed of the cause of their being called to distant work at such a time, it is clear that their foreman was so informed, and that on arriving at the obstruction, the situation was obvious, and also the necessity for clearing the track and causing that work, then only begun, to be hurried through, although in the night; and this could leave no other inference than

that the disaster had just happened, and that the work of removing the broken rock was being prosecuted by the workmen, caring for their own safety. The absence of sufficient light to enable them to carefully examine the cliff naturally occurred from the coming on of night and the hasty want of preparation, and was patent equally to all the men engaged. Gulf, etc., v. Jackson, 65 Fed. 48, 51, 12 C. C. A. 507.

As before stated, in the case of a sudden disaster like this rock slide, stopping all trains on a railroad, it was the duty of the servants without orders to enter on the work of clearing the tracks, and of the railroad company, without waiting for inspection, to direct its servants to hasten to the place and engage in that work, expecting the servants to use their own senses and judgment in avoiding dangers. The circumstances gave the servants no right to assume that a safe place was prepared and furnished, or any inspection had, other than such examination as had been or might be made by fellow servants in prosecuting the work. It appears that John McGrath had assumed to make such examination as he deemed proper. If he was negligent in this, although he was a foreman, he was engaged in a common employment with the others, and was a fellow servant. Balch v. Haas, 73 Fed. 974, 978, 20 C. C. A. 151. So, also, was Miles McGrath, the roadmaster. He had no entire control of any separate department, but was engaged, like the other servants and the foremen, in the common employment of keeping the road in repair, and was subject to the orders of the superintendent and trainmaster. Northern Pacific Ry. Co. v. Dixon, 194 U. S. 338, 343, 24 Sup. Ct. 683, 684, 48 L. Ed. 1006. In this case the court says:

"We have no hesitation in holding, both on principle and authority, that the employer is not liable for an injury to one employé occasioned by the negligence of another engaged in the same general undertaking; that it is not necessary that the servants should be engaged in the same operation or particular work. It is enough to bring the case within the general rule of exemption if they are in the employment of the same master, engaged in the same common enterprise, both employed to perform duties tending to accomplish the same general purposes; or, in other words, if the services of each in his particular sphere or department are directed to the accomplishment of the same general end."

Here all these servants, including the foremen and the roadmaster, were, when the disaster happened, engaged in the common work and enterprise of keeping the railway in proper condition for the passage of trains. The disaster caused an instant sudden emergency in the very work in which they were engaged. An emergency admitting of no delay—not even for daylight—certainly not for the summoning of the managing officers of the railway or of its engineers. The work to be done was simply the rough work of clearing the tracks of the fallen rocks, which the servants, under their foremen and roadmaster, were entirely competent to perform. The circumstances and conditions must have made it plain to all that no inspection or precaution respecting the cliff was or could have been had except by such of the servants as were there while it was daylight. Under these circumstances the servants who came later as well as those who were there in daylight assumed the risk of the

employment they engaged in; and if John McGrath or Miles Mc-Grath were negligent in representing the place to be safe, that was negligence of fellow servants. Northern Pacific Co. v. Dixon, above cited; Pennsylvania Co. v. Fishack, 123 Fed. 465, 59 C. C. A. 269.

It is unnecessary to consider in detail the several assignments of error. The instructions to the jury throughout conformed to the theory presented by the instruction above quoted.

The judgment is reversed, and the cause remanded, with direc-tions to grant a new trial.