## AMERICAN BRIDGE CO. v. SEEDS.

### (Circuit Court of Appeals, Eighth Circuit.　March 9, 1906.)

### No. 2,255.

1. MASTER AND SERVANT—NEGLIGENCE—ASSUMPTION OF RISK OF SUPERIOR FELLOW SERVANT'S DIRECTIONS.

A servant assumes the risk of the negligence of his superior fellow servant in the latter's direction of the men, of the machinery, and of the work, to the same extent that he assumes the risk of the negligence of the fellow laborer by his side, who is engaged in performing the work.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 449–474, 567–573.

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessy, 38 C. C. A. 314.]

2. NEGLIGENCE—INDEPENDENT INTERVENING CAUSE THE ONLY PROXIMATE CAUSE.

An alleged act of negligence, which would not have produced the injury, but for the interposition of an independent cause which could not have been reasonably anticipated, but which turned aside the natural sequence of events and produced the result, is not the proximate cause of the injury and is not actionable. The intervening cause is the only proximate cause.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Negligence, §§ 76–79.]

3. MASTER AND SERVANT—PROXIMATE CAUSE—PROBABLE EFFECT OF ACTS RIGHTLY ESTIMATED ON BASIS THAT OTHERS WILL OBEY LAW AND DISCHARGE DUTY.

The legal presumption is that men will obey the law and discharge their duties, and this is the only practicable foundation for rational action or expectation.

A master, therefore, may lawfully estimate the natural and probable effect of his acts upon the assumption that his servants and others will discharge their duties.

**4. SAME—NEGLIGENCE—DUTY OF MASTER REGARDING SAFE PLACE AND MACHINERY AND ITS LIMITATIONS.**

It is the duty of the master to use ordinary care to furnish reasonably safe instrumentalities with which his servants may perform their work, and a reasonably safe place in which they may render their service. But this duty has its legal and rational limits.

[Ed. Note.—For cases in point, see vol. 34 Cent. Dig. Master and Servant, §§ 173, 178, 179.]

**5. SAME—DUTY TO PROTECT FROM DANGERS OF NEGLIGENT OPERATION SERVANT'S AND NOT MASTER'S.**

The duty of construction and provision is the master's. The duty of operation and of protection from negligent use is the servant's.

The duty of so using a reasonably safe place, and of so operating a reasonably safe machine, that neither the place nor the machine shall become dangerous by their negligent use or operation, is the duty of the servants to whom the use or operation is intrusted, and it is not any part of the positive duty of the master.

|Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 267.]

**6. SAME—WHERE WORK NECESSARILY CHANGES CHARACTER AS TO SAFETY, DUTY OF CARE FOR SAFETY THE SERVANT'S AND NOT THE MASTER'S.**

The duty of caring for the safety of a place or of machinery in cases, in which the work which the servants are employed to do necessarily changes the character of the place or of the machinery as to safety, as the work progresses, is the duty of the servants to whom the work is intrusted, and it is not the duty of the master.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 266.]

**7. SAME—WHERE WORK IS TO MAKE DANGEROUS PLACE SAFE, OR VICE VERSA, DUTY OF CARE FOR SAFETY IS SERVANT'S, NOT MASTER'S.**

Where the work which the servants are employed to perform is to make a reasonably safe place dangerous, or an obviously dangerous place safe, the duty to care for the safety of the place is the servant's and not the master's.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 171.]

**8. MASTER AND SERVANT—NEGLIGENCE—FACTS—DECISION.**

A bridge company so constructed falsework for the rebuilding of a bridge and rails parallel to and outside the bridge for a traveler, which carried blocks and tackle and other machinery, that there was a space nine feet wide between the traveler runs and stringers on the sides of the bridge. Loose planks 12 feet apart extended from the stringers to these rails. The foreman of the plaintiff's gang ordered him to cross from one of the traveler runs to the stringer and hitch the runner of the tackle to some iron chords. He did so, and started back across the open space upon a plank; but, before he had crossed, the foreman gave to the man, who operated the blocks and tackle by means of an engine, a signal to raise the load rapidly, and as it rose it swung against the plaintiff and the plank and knocked them to the ice below. The company furnished materials sufficient to floor the place and to make a snub line.

*Held:* (1) The proximate cause of the accident was the inopportune signal of the foreman, the risk of which was assumed by the plaintiff; and (2) neither the uncovered space nor the absence of the snub rope constituted the breach of any duty of the master to the plaintiff.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Kansas.

The American Bridge Company, the defendant below, complains of a judgment which Edward M. Seeds recovered against it for an injury he sustained

while he was in its employment. The bridge company was engaged in removing the old railroad bridge and in constructing a new bridge across the Missouri river at Atchison. Piles had been driven into the bed of the river, and falsework had been erected upon these piles to support the railroad, while the work was in progress, and also to hold the machinery requisite to accomplish the undertaking. On each side of the old bridge and of the falsework which supported the railroad during the progress of the work, and about 10 feet distant from the middle line of the railroad, a line of stringers 16 inches wide was placed properly supported, and 9 feet farther distant from the middle line of the railroad a line of rails was located and sustained. This line of rails and its support were termed in the testimony the "traveler run." It is customary in the construction of such work to erect the traveler runs within 2 feet of the lines of stringers, so that the workmen may step from one line to the other, but, on account of the width of the bridge at the draw, the runs in this instance were constructed about 9 feet distant from the stringers. This space of 9 feet was bridged by caps about 18 feet apart and by loose planks 10 or 12 feet apart. Planks, boards, nails, and bolts in sufficient quantities to have covered this space with a secure floor had been furnished by the defendant, but they had not been used for this purpose. Upon wheels upon the two traveler runs stood a structure called a "traveler" which was 28 feet long, 38 feet wide at the base, 30 feet wide at the top, and 54 feet high. As the work progressed this structure was drawn along the rails and was used to support the men and the machinery required to do the work of removing the old and placing the new materials. Attached to a crosspiece in the top of this traveler were blocks and tackle by means of which heavy weights might be raised and lowered. The rope which constituted the tackle-fall extended from the blocks a distance of 150 or 200 feet and was there coiled about a spool or niggerhead, which was revolved by an engine. The rope or the runner attached to the lower block ended in a chain and hook which were used to hitch onto materials which the workmen desired to raise and move. The engineer and the man in charge of the niggerhead were able by these devices to control the time when, and the speed with which, such material should be raised or lowered in response to the signals of the foreman. The men engaged in the work comprised several gangs in charge of several foremen, respectively. The parts of the work which these gangs should do were assigned to their foremen by a general superintendent, who was himself subject to the directions of the superintendent of the district, which comprised several states. The gang of which the plaintiff was a member was removing the materials of the old bridge on its north side by the use of the traveler and the machinery therein. The plaintiff was an experienced bridge builder and had been employed upon this bridge for about 10 days. He knew that the traveler run and the stringer were about 30 feet above the ice in the river below, and that the space between them was bridged by the caps and by the occasional loose planks and by these alone. At the time of the accident two iron chords, which were about 16 feet long and which weighed about 1,000 pounds, lay near the foot of the traveler. The west ends of these chords rested on the stringer, and their east ends on the bridge. The foreman was endeavoring to raise them and put them on a car by means of the blocks and tackle. Another workman had wrapped the chain of the runner around the chords and hooked it, but, when the engine and the niggerhead commenced to pull on the tackle-fall, the chain became unhitched. Just then the plaintiff came down from the traveler to its run and the foreman of his gang said to him: "Go there and hook that chain, and don't be in such a damned hurry to get away. You men are in too damned big a hurry to get away from the work. Stay there until I tell you to leave. That's what I am here for." One of the loose planks extended from the traveler run to the stringer a step or two west of the west ends of the chords. The plaintiff walked across to the stringer upon this plank; thence along the stringer to about the middle of the chords, where he wrapped the chain around the chords, hooked it, and waited until he saw that it would not become unhitched. His foreman stood 4 or 5 feet higher than he did, and 5 or 10 feet southeast of him, where the man at the niggerhead could see his signals. There were other signals which meant that the runner should be drawn up slowly and

steadily, and there was a signal called the "highball," which signified that the load should be raised as rapidly as possible. The point at which the runner was fastened to the chords was about 12 feet farther east than the point of the attachment of the upper block to the cross-piece in the top of the traveler, so that as the load was raised it necessarily swung to the west at least 12 feet. A snub line is a line attached at one end to a load that is swinging or that may swing while it is held by the operator at the other end or wrapped about some fixed object by him, and it is used to prevent or control the swing of the load. The defendant had furnished suitable rope in ample quantity for such a line, but none was used upon these chords. As soon as the plaintiff saw that his hitch would hold, he walked back west along the stringer to the plank and upon the latter for the purpose of returning to the traveler run. As soon as he left the hitch the foreman gave the signal called the highball, and the man at the niggerhead raised the chords as rapidly as the machinery would permit, the load swung west, and knocked the plaintiff and the plank upon which he was crossing, to the ice below, before he could reach the traveler run. In this state of the facts the court below denied a motion to instruct the jury to return a verdict for the defendant and allowed them to render one against the defendant for causal negligence: (1) Because it did not build its traveler run within 2 feet of the stringers, instead of 9 feet distant therefrom; (2) because it did not cover this space of 9 feet with a nailed or bolted floor; and (3) because it did not use a snub line on the load. This ruling is assigned as error.

Hale Holden (William Warner, O. H. Dean, W. D. McLeod, and H. C. Timmonds, on the brief), for plaintiff in error.

P. Hayes, for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The foreman was the fellow servant of the plaintiff, and the latter necessarily assumed the risk of the former's negligence, including the risk of the order which he gave to the plaintiff and the risk of the signal which he gave to the man at the niggerhead. The servant assumes the risk of the negligence of his superior fellow servant in the direction of the men and of the work, to the same extent that he assumes the risk of the negligence of the fellow laborer by his side who is engaged in performing the work. Weeks v. Scharer, 49 C. C. A. 372, 377, 111 Fed. 330, 335; Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772; Railroad Co. v. Hambly, 154 U. S. 359, 14 Sup. Ct. 983, 38 L. Ed. 1009; Railroad Co. v. Conroy, 175 U. S. 323, 20 Sup. Ct. 85, 44 L. Ed. 181; City of Minneapolis v. Lundin, 58 Fed. 525, 527, 7 C. C. A. 344, 346; Coal Co. v. Johnson, 56 Fed. 810, 6 C. C. A. 148; Railway Co. v. Waters, 70 Fed. 28, 16 C. C. A. 609; Balch v. Haas, 73 Fed. 974, 979, 20 C. C. A. 151, 156; Bridge Co. v. Olsen, 108 Fed. 335, 337, 47 C. C. A. 367, 369, 54 L. R. A. 33; Railway Co. v. Elliott, 102 Fed. 96, 111, 42 C. C. A. 188, 193; Millsaps v. Railway Co., 69 Miss. 423, 13 South. 696; Railroad Co. v. Hoover, 79 Md. 253, 29 Atl. 994, 25 L. R. A. 710, 47 Am. St. Rep. 392; Blessing v. Railway Co., 77 Mo. 410; 2 Bailey, Pers. Inj. §§ 2061, 2190; Railroad Co. v. Poirier, 167 U. S. 48, 17 Sup. Ct. 741, 42 L. Ed. 72; Oakes v. Mase, 165 U. S. 363, 17 Sup. Ct. 345, 41 L. Ed. 746; Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590, 29 L. Ed. 755; Randall v. Railway Co., 109 U. S.

478, 3 Sup. Ct. 322, 27 L. Ed. 1003; Farwell v. Railroad Co., 4 Metc. (Mass.) 49, 38 Am. Dec. 339; Holden v. Railroad Co., 129 Mass. 268, 37 Am. Rep. 343; Clifford v. Railroad, 141 Mass. 564, 6 N. E. 751; Sherman v. Railroad Co., 17 N. Y. 153; Besel v. Railroad Co., 70 N. Y. 173; De Forest v. Jewett, 88 N. Y. 264; Weger v. Railroad Co., 55 Pa. 460; Coal Co. v. Jones, 86 Pa. 432.

The facts of this case leave no alternative but the conclusion that the inopportune signal of the foreman to rapidly raise the iron chords and let them swing against the plaintiff before he had reached a place of safety was the active and efficient cause of the injury. If that signal had not been given until the plaintiff had reached the traveler run, the accident would not have happened. No one could have reasonably anticipated that the foreman would give such a signal at such a time. The plaintiff testified: "If I had known a signal of that kind was going to be given, I never would have gone there to hook onto the bars." That signal was not induced by the omission to cover the space between the traveler run and the stringer, nor by the failure to attach a snub rope to the load. It was an act of another human agency independent of either of the parties to this action.

It is not conceded that the alleged omissions of the defendant constituted any breach of its duty to the plaintiff to exercise ordinary care to provide him a reasonably safe place in which to do his work. But, if they had constituted such a breach, it is not perceived how they could sustain a judgment against the bridge company for an injury caused by the negligent act of another, which it did not induce and could not have foreseen. The test of liability in cases of alleged concurring negligence, like the one in hand, is the same as in all other actions for negligence. It is the true answer to the questions: Was the injury the natural and probable consequence of the acts on which the action is based? was it reasonably to be anticipated from them? If it was, the action may be maintained, although the negligence of another concurred to produce it. The burden of proof was upon the plaintiff to establish a state of facts which would naturally lead to the conclusion that his fall was the natural and probable consequence of the loosely planked space and of the absence of the snub rope. The only evidence upon this subject was the evidence of experience. These omissions never did cause a fall. None ever occurred until a new and independent force, the careless signal of the foreman, sent the swinging load against the plaintiff and threw him to the ice below.

There is no duty imposed upon a master to anticipate breaches of duty on the part of his servants, but he may lawfully reckon the natural and probable result of his actions upon the supposition that his servants will obey the law and faithfully discharge their duties. The legal presumption is that they will do so, and this is the only practicable basis for the measurement of the acts, rights, or remedies of mankind. Little Rock & Memphis R. R. Co. v. Barry, 84 Fed. 944, 950, 28 C. C. A. 644, 650, 43 L. R. A. 349; Cole v. German Sav. & Loan Soc., 59 C. C. A. 593, 599, 124 Fed. 113, 119, 63 L. R. A. 416. Mr. Justice Holmes in delivering the opinion in Burt v. Ad-

144 F.—39

vertiser Newspaper Co., 154 Mass. 238, 247, 28 N. E. 1, 6, 13 L. R. A. 97, said:

"Wrongful acts of independent third persons, not actually intended by the defendant, are not regarded by the law as natural consequences of his wrong, and he is not bound to anticipate the general probability of such acts, any more than a particular act by this or that individual."

In the light of these established rules of law, there seems to be but one admissible answer, upon the facts in this case, to the question whether or not the alleged omissions of the defendant were the proximate cause of the injury of the plaintiff. Wharton says:

"Supposing that, had it not been for the intervention of a responsible third party, the defendant's negligence would have produced no damage to the plaintiff, is the defendant liable to the plaintiff? The question must be answered in the negative, for the general reason that causal connection between negligence and damage is broken by the interposition of responsible human action. I am negligent on a particular subject-matter as to which I am not contractually bound. Another person, moving independently, comes in, and either negligently or maliciously so acts as to make my negligence injurious to a third person. If so. the person so intervening acts as a nonconductor, and insulates my negligence, so that I cannot be sued for the mischief which the person so intervening directly produces. He is the one who is liable to the person injured." Whart. Neg. § 134.

Bishop on Noncontract Law, § 42, says:

"If, after the cause in question has been in operation, some independent force comes in and produces an injury, not its natural or probable effect, the author of the cause is not responsible."

Judge Cooley and the Supreme Court of North Carolina say in his words:

"If the original wrong only becomes injurious in consequence of the intervention of some distinctly wrongful act or omission by another, the injury shall be imputed to the last wrong as the proximate cause, and not to that which was more remote." Clark v. Wilmington, etc., R. Co., 109 N. C. 430, 449, 14 S. E. 43, 14 L. R. A. 749.

The independent voluntary act of the foreman who gave the reckless signal which sent the iron chords against the plaintiff and knocked him off the bridge was a breach of his duty incapable of anticipation. This act of an independent human agency broke the chain of causation between the prior alleged negligence of the defendant and the injury of the plaintiff, insulated its omissions from the plaintiff's hurt, and discharged the defendant from all liability for it. Cole v. German Sav. & Loan Soc., 59 C. C. A. 593, 600, 124 Fed. 113, 120, 63 L. R. A. 416; Railway Company v. Kellogg, 94 U. S. 469, 475, 24 L. Ed. 256; Insurance Co. v. Boon, 95 U. S. 117, 130, 24 L. Ed. 395; Goodlander Mill Co. v. Standard Oil Co., 63 Fed. 400, 405, 11 C. C. A. 253, 258, 259, 27 L. R. A. 583; Chicago, St. P., M. & O. Ry. Co. v. Elliott, 55 Fed. 949, 951, 5 C. C. A. 347, 349, 20 L. R. A. 582. The case presents no evidence to sustain the conclusion that these omissions were a proximate cause of the accident to the plaintiff.

The case presents another question, was the bridge company guilty of any breach of duty to the plaintiff by reason of its alleged acts of negligence? It owed no duty to the plaintiff regarding the distance at which the traveler runs should be placed from the bridge or the

stringers, and their location nine feet distant from the latter constituted no negligence actionable by him, because the purpose of their construction was not to provide a place for him or for other workmen to labor or to travel, but it was to furnish an adequate support for the traveler. The company had the legal right to place these runs whereever in its judgment they would most efficiently accomplish this purpose, and its exercise of that right was no violation of any duty it owed to the plaintiff.

When the traveler runs had been constructed, there was a space nine feet wide between them and the stringers. The bridge company furnished to its workmen proper materials to floor this space and suitable ropes to make a snub line, but it constructed no floor, and it neither made a snub line nor attached one to the swinging load. It is contended that these omissions constituted a breach of its duty to exercise reasonable care to provide the plaintiff with a reasonably safe place to work. It is the duty of the master to use ordinary care to furnish reasonably safe machinery and instrumentalities with which his servants may perform their work and a reasonably safe place in which they may render their service, and this duty may not be so delegated by him that he may escape liability for its breach. Nevertheless, this duty has its rational and legal limits. It does not extend to the guarding of the safety of a place or of a machine against its negligent use by the servants. The risk that a safe place will become unsafe, or that safe machinery will become dangerous, by the negligence of the servants who use them, is one of the ordinary risks of the employment which the servants necessarily assume when they accept it. It is a risk of operation and not of construction or provision, and the duty to protect place and machinery from dangers arising from negligence in their use is a duty of the servants who use them, and not that of the master who furnishes them. A railroad and its equipment is a place to labor and a machine with which to perform work. Originally safe, it is made dangerous by the failure of a servant engaged in operating a train to properly turn a switch (St. Louis, Iron Mountain & Southern R. Co. v. Needham, 63 Fed. 107, 11 C. C. A. 56, 25 L. R. A. 833); by the failure of a switchman to properly place red lights (Brady v. Chicago & G. W. Ry. Co., 114 Fed. 100, 103, 52 C. C. A. 48, 51, 57 L. R. A. 712); by the direction of a yardmaster to an engineer and conductor to take their train over a track on which another train is standing (Pennsylvania Co. v. Fishack, 123 Fed. 465, 467, 59 C. C. A. 269); by the failure of an engineer to obey his instructions which results in a collision (B. & O. R. Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772; Howard v. Denver & R. G. R. Co. [C. C.] 26 Fed. 837, where Judge Brewer said: "The true idea is that the place and the instrument must in themselves be safe, for this is what the master's duty fairly compels, and not that the master must see that no negligent handling by an employé of the machinery shall create danger"); by a failure of a conductor to require his brakeman to remain on the top of a train whereby a break occurs without their knowledge (Railroad Co. v. Conroy, 175 U. S. 323, 327, 20 Sup. Ct. 85, 44 L. Ed. 181); by the negligence of a conductor whereby the place where a laborer is build-

ing a culvert is made dangerous, and he is struck by the locomotive (Northern Pac. Ry. Co. v. Hambly, 154 U. S. 349, 14 Sup. Ct. 983, 38 L. Ed. 1009) ; by the act of the foreman of a gang of laborers who suddenly stops a handcar without notice and causes a collision with another immediately following (Northern Pac. R. Co. v. Peterson, 162 U. S. 346, 348, 16 Sup. Ct. 843, 40 L. Ed. 994) ; by the disobedience of a rule which requires personal notice to workmen on certain tracks that cars are to be moved thereon (Grady v. Southern Ry. Co., 34 C. C. A. 494, 92 Fed. 491) ; by the failure of an engineer and a foreman to take notice of and prevent an approaching collision of an engine and a handcar (Martin v. Atchison, etc., R. Co., 166 U. S. 399, 403, 17 Sup. Ct. 603, 41 L. Ed. 1051) ; and by a thousand other acts of negligence of servants of railroad companies, which make the places where their fellow servants are employed and the machinery which they are using more dangerous. But the duty of the master does not extend to guarding the places or the machinery he furnishes against the dangers of such acts. They are violations of the primary duty of the servants.

Again, a superintendent who is a fellow servant of the workmen under him negligently directs them to use a derrick furnished by the employer to raise heavy weights before the derrick is securely fastened in its place, and it consequently falls and injures a workman (Kelly v. Jutte & Foley Co., 104 Fed. 955, 957, 44 C. C. A. 274) ; an officer upon a ship carelessly leaves a hatchway open, and a servant falls through it and is injured (Olson v. Oregon, etc., Co., 104 Fed. 574, 44 C. C. A. 51) ; a foreman or any other workman whom the master employs to watch and remove a rope in a derrick when it becomes worn or weak directs or permits the use of an old rope to raise a heavy weight, the rope breaks and entails injury upon a fellow workman (Vogel v. American Bridge Co., 180 N. Y. 373, 73 N. E. 1; Johnson v. Boston Tow-Boat Co., 135 Mass. 209, 46 Am. Rep. 458; Cregan v. Marston, 126 N. Y. 568, 572, 27 N. E. 952, 22 Am. St. Rep. 854 [in which the rule in such cases is laid down in these words: "It is not the master's duty to repair defects arising in the daily use of the appliance for which proper and suitable materials are supplied, and which may easily be remedied by the workmen, and are not of a permanent character or requiring the help of skilled mechanics"] ; McGee v. Boston Cordage Co., 139 Mass. 445, 1 N. E. 745; Webber v. Piper, 109 N. Y. 496, 17 N. E. 216). None of these acts constitute violations of the duty of the master. They illustrate the rule that the duty of so using a reasonably safe place and of so operating a reasonably safe machine that neither the place nor the machine shall become dangerous by their negligent use or operation is the duty of the servants who use or operate them, and not a part of the positive duty of the master. Brady v. Chicago & G. W. Ry. Co., 114 Fed. 100, 103, 52 C. C. A. 48, 51, 57 L. R. A. 712, and cases cited supra.

Nor does the positive duty of the master extend to keeping a place or machinery safe, where the work which the servants are employed to do necessarily changes the character of the place or of the machinery as to safety as the work progresses; but the duty of care for the

safety of the place and of the machinery in such cases devolves upon the servants to whom the work is intrusted. Different classes of servants are employed to construct a building. An omission of the bricklayers to secure a timber in a wall results in the injury of a carpenter who is directed to work about it (Armour v. Hahn, 111 U. S. 313, 318, 14 Sup. Ct. 433, 28 L. Ed. 440) ; a foreman of a gang of laborers engaged in the construction of a sewer causes dynamite to be placed in a hole in a rock, and after it has failed to explode orders a workman who is ignorant of its presence to drill it out, and he is injured by the explosion his obedience causes (Minneapolis v. Lundin, 58 Fed. 525, 528, 7 C. C. A. 344, 347) ; workmen in a mine fire a blast which loosens a superincumbent mass and makes the place beneath it dangerous, and one of them proceeds with his work under it and is injured by its fall (Finalyson v. Utica Min. & Mill. Co., 67 Fed. 507, 510, 14 C. C. A. 492, 495) ; a foreman directs his gang to remove iron braces from the top of a pile that is safe when undisturbed, and thereby causes it to topple over upon a fellow servant (Lach v. Burnham [C. C.] 134 Fed. 688) ; a foreman engaged with his gang in tearing down a shed negligently directs one of his workmen to cut away a post and thereby causes a portion of the structure to fall upon him (Cleveland, C., C. & St. L. R. Co. v. Brown, 73 Fed. 970, 972, 20 C. C. A. 147) ; a foreman and his company pile heavy castings so negligently that they fall upon one of the workmen (Deye v. Lodge & Co. [C. C. A.] 137 Fed. 480)—but in none of these or like cases is there any violation of any duty or any liability of the master. As the court said in the case last cited:

"The master's obligation to supply a safe place for his work to be done and to keep it safe does not impose the duty of always keeping it in a safe condition, so far as its safety depends upon the proper performance of the very work which his servants have there undertaken to do. If a negligent manner of doing the work makes the place less safe, that is one of the risks which all engaged in the work have assumed as a risk of the occupation."

And, finally, the positive duty of the master does not extend to making or keeping a place reasonably safe, where the work is to make a reasonably safe place dangerous, or an obviously dangerous place safe, as in blasting rocks, tearing down structures and removing superincumbent masses. Finalyson v. Utica Min. & Mill. Co., 67 Fed. 507, 14 C. C. A. 492; Gulf, etc., R. Co. v. Jackson, 65 Fed. 48, 12 C. C. A. 507; Florence, etc., R. Co. v. Whipps (C. C. A.) 138 Fed. 13; Moon-Anchor Consol. Mines Co. v. Hopkins, 111 Fed. 298, 303, 49 C. C. A. 347, 352.

The limitations upon the positive duty of the master respecting the safety of the place and the machinery, which these authorities establish and illustrate, leave no doubt how the question of the liability of the bridge company in this case should be answered. The structure which it raised to rebuild the bridge at Atchison was not of the nature of a finished and permanent building. It was erected for a single purpose. It is not customary to provide falsework constructed for the purpose of rebuilding bridges with floors covering the intervening spaces between the timbers. The lack of them is obvious, and no one who takes service upon such structures can fail to appreciate

or to assume the obvious risk of their absence. Cole v. German Sav. & Loan Soc., 59 C. C. A. 593, 124 Fed. 113, 63 L. R. A. 416.

The bridge company supplied materials to cover the open space of which complaint is made, and ropes to make a snub line, and committed the structure and the materials to its servants to enable them to do the requisite work. They then had the means and the option to do it with or without a secure covering over the spaces between the traveler runs and the stringers, and with or without the snub line. The structure and materials were in themselves sound and suitable for the work of rebuilding the bridge. The duty to so use the materials and to so operate the blocks and tackle that they should continue to be reasonably safe, while the work progressed, was a duty of continuous care and of operation which the law imposes upon the servants and not upon the master, and any breach of that duty was the negligence of the fellow servants of the plaintiff, and not that of the bridge company.

For these reasons, the judgment below must be reversed, and the case must be remanded to the Circuit Court with instructions to grant a new trial, and it is so ordered.