## McCLINTIC-MARSHALL CONST. CO. v. FORGY.

(Circuit Court of Appeals, Eighth Circuit. September 29, 1917. Rehearing Denied December 10, 1917.)

### No. 4685.

1. MASTER AND SERVANT ⬡⟞286(22)—MASTER'S LIABILITY FOR INJURY TO SERVANT—UNSAFE PLACE TO WORK.

Defendant as contractor was building a large railroad bridge over the Missouri river in which it constructed and used a number of service tracks for moving material and supplies. It also used two crane cars, each consisting of a revolving crane mounted on a flat car with a boiler and engine which propelled the car and also operated the crane. The boiler on one of the cars became out of repair, and it was moved with the cars in its train upon a little-used service track where plaintiff's intestate, who was its engineer, and another, worked the greater part of a day in removing the boiler tubes. While deceased was so at work standing at the end of the car, between that and the others which had been moved to a little distance to make room, such other cars were pushed up by the other crane car, and he was crushed between them. No flag or other warning signal was placed on the standing cars, as is the rule with railroad companies, and the evidence was conflicting as to whether any notice was given deceased of the approach of the moving cars. Held, that the nature of the work being done on the track made it in effect a repair track, and the duty of defendant in the exercise of reasonable care to see that such warning was given to the workmen, and that whether or not it performed such duty was a question of fact for the jury.

2. MASTER AND SERVANT ⬡⟞201(7)—MASTER'S LIABILITY FOR INJURY TO SERVANT—FELLOW SERVANTS.

A master is liable for the injury or death of a servant of which its own negligence is a proximate cause, although the negligence of fellow servants was a concurring cause.

3. LIMITATION OF ACTIONS ⬡⟞130(3)—SUIT FOR WRONGFUL DEATH—NONSUIT IN PRIOR ACTION.

A second action for the wrongful death of a person, brought after a nonsuit in the first action, is upon the same cause of action within the Missouri statute of limitations, although the allegations specifying the negligence charged may vary.

Sanborn, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Action by Elnora Forgy against the McClintic-Marshall Construction Company. Judgment for plaintiff, and defendant brings error. Affirmed.

H. M. Langworthy, of Kansas City, Mo. (O. H. Dean and W. D. McLeod, both of Kansas City, Mo., on the brief), for plaintiff in error.

C. W. Prince, of Kansas City, Mo. (E. A. Harris, J. N. Beery, and J. E. Westfall, all of Kansas City, Mo., on the brief), for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and AMIDON, District Judge.

⬡⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

AMIDON, District Judge. This is an action to recover damages for death by wrongful act. The plaintiff below, Elnora Forgy, widow of decedent, prevailed, and the defendant, the McClintic-Marshall Construction Company, brings error.

[1] These are the facts: The defendant was engaged in constructing a bridge across the Missouri river at Kansas City, for the Burlington Railroad and Armour & Co. It was a large enterprise requiring several years for its completion. To aid in the work, defendant built two sets of double tracks; one running north and south parallel with the approach to the bridge, the other two east and west crossing the first tracks at right angles. The latter were known as service tracks. At the west end they were connected with the yards of the Burlington and Wabash railroads so that cars loaded with materials could be brought in over them by means either of switch engines or the crane cars owned by defendant. These tracks terminated at their eastern end in what was known as storage and assembling yards, where material for the bridge was unloaded, and some work done assembling different parts.

For the purpose of handling the bridge material, defendant had two locomotive crane cars, to each of which were attached three ordinary flat cars upon which material could be loaded. The cranes were themselves mounted on an ordinary eight-wheel railroad flat car. They each weighed 86 tons, and had a capacity of 30 tons. The cars were propelled by the same engine that operated the cranes. The cranes, together with the boiler, engine, and machinery, were mounted upon a frame which rested upon small wheels arranged in a circle. These in turn ran on a circular track on the surface of the flat car. In swinging, the crane did not have an independent motion, but the entire framework revolved about on the circular track. In other words, the crane is what is known as a "whirly."

The boiler was upright. At the bottom was the ash pan, next the grate and fire box, above this were the flues, and at the top were the hood and smokestack. The boiler was inclosed in a cab. It and some of the machinery was covered by a semicircular roof. The cab was nearly flush with the end of the car when the crane was pointing in the same direction as the car.

The flues are fitted into an upper and lower flue sheet. They are not only expanded so as to fit tightly into the sheets, but extend about one-eighth of an inch beyond them, and are then beaded against the sheet at each end.

These locomotive cranes were known as Nos. 15 and 17. Forgy, the decedent, was engineer on No. 15. For some time prior to the accident, the flues on his engine had been leaking. On the morning of March 28, 1911, he and another workman were directed to take out the leaking flues preparatory to installing new ones. In doing this he was directed by the superintendent to place his crane car, and the cars usually attached to it, on one of the service tracks at a point little used. The crane and the cars were run in on this track by their own power. The crane car was then uncoupled and removed about 3 or 4 feet from the flat cars, leaving the latter standing on the track to the west, the

direction from which they had come in and from which they would have to be taken out.

We pause here to call attention to the fact that the flat cars were separated from the crane car at the time they were set in on the service track, thus clearly indicating that in the judgment of the men it was necessary for the workmen engaged in removing the flues to get in on the track between the flat cars and the crane car.

The removal of the flues was commenced at about 9 o'clock in the morning by Forgy and the assistant master mechanic, a man by the name of Marshall. The hood and smokestack were removed so that one workman could get down to the upper flue sheet and by means of a hammer and cold-chisel cut off the beading. There is conflict in the evidence as to how the other workmen reached the beading at the other end of the flues. On the east side of the boiler as it stood at the time, there was a door inside the cab leading to the fire box. Some of the evidence tends to show that the bottom of the flues was reached through this door. There was another door leading to the ash pan, opening on the west side of the boiler and cab. It was 18 inches long and 7 or 8 inches high. In our judgment the weight of the evidence shows that the lower beading could be most conveniently reached through this door. The ash pan and the grate had been removed, and this also confirms the evidence that at least part of the work was done through this opening. That is the usual method of reaching the bottom flue sheet of such a boiler for the purpose of removing the flues. The light is better than through the door inside the cab. All the evidence shows that the flues were driven out from below and removed through the opening left at the top by taking off the hood and smokestack.

At about 4 o'clock in the afternoon Forgy was standing on the ground at the west end of his crane car, between it and the flat cars, looking up through the ash pan door into the boiler, with his hammer and chisel in his hands. At that time crane No. 17, with its three freight cars attached, by direction of the superintendent ran in on the siding for the purpose of removing the other crane and cars to a point in the yard where the flue chambers could be cleaned out with a hose. No immediate warning was given to Forgy. No. 17, with its loaded cars, struck the three flat cars that were standing on the track, and pushed them against the other crane car. Forgy was caught between the two drawheads and killed.

Did defendant owe deceased the duty to warn him before disturbing the car on which he was working? Defendant answers that question in the negative. It offered evidence to the effect that it was not customary on jobs of this character to warn workmen of the movement of the cranes or cars; that it was the practice and duty for men to look out for themselves. This evidence was not directed to workmen engaged on the class of work that Forgy was doing. We are of the opinion that when the nature of his work is considered the company owed him the duty of reasonable care for his protection. It was impossible for him to do his work and keep watch of the movements of engines. For all practical purposes the situation is identical with that of a workman engaged in repairing a railroad car. The rule in force

on nearly all railroads in the United States for many years requires that such a car (1) be protected by a blue flag by day and a blue light at night; (2) that only the workmen repairing the car can remove the warning. There was no direct evidence in the trial court in relation to this rule, but it has been quoted in text-books and in countless judicial opinions, and may properly be referred to in determining whether the judgment below should be reversed. The trial court, in order to avoid the danger that the jury would give plaintiff the benefit of the fellow-servant law of Missouri (which is applicable only to railroads proper), excluded evidence as to this rule. We think the situations were so nearly identical that the evidence might well have been received. But be that as it may, we think it may at least be considered by this court in determining whether the trial court properly left to the jury to say whether defendant exercised reasonable care with respect to Forgy. In our judgment that question was one of fact and not of law. The rule which has been stated with increasing emphasis by the Supreme Court is expressed in the following language in Kreigh v. Westinghouse, 214 U. S. 249, 256, 29 Sup. Ct. 619, 622 (53 L. Ed. 984):

"Where workmen are engaged in a business more or less dangerous, it is the duty of the master to exercise reasonable care for the safety of all his employés, and not to expose them to the danger of being hurt or injured by the use of a dangerous appliance or unsafe place to work, where it is only a matter of using due skill and care to make the place and appliances safe. There is no reason why an employé should be exposed to dangers unnecessary to the proper operation of the business of his employer."

That rule is based upon the simplest considerations of humanity as well as justice. The courts would be false to their trust if they did not enforce it. The duty which it imposes cannot be met by renunciation or by shifting the entire responsibility upon workmen to avoid injury. We are of the opinion therefore that the learned trial judge exercised a sound discretion when he left this question to the jury.

Did the defendant warn Forgy before disturbing the car? Upon that question the evidence is in hopeless conflict. It may be considered under two headings: First, there was evidence that the man in charge of crane No. 17, as he passed within about 75 yards of Forgy, called out to him, "Look out, Big Jack, we are coming in there after you," and that Forgy said nothing, "just turned around and grinned at me." Springer, the man who says he gave this warning, was standing on the rear end of the flat cars attached to No. 17. On the opposite side of the car, and between him and Forgy, another witness was standing. He says he heard no such call. Another witness standing on the ground between Forgy and No. 17 says he did not hear it. It must be presumed from Forgy's subsequent conduct that he did not hear the warning. The wind was blowing at the time 38 miles an hour from Forgy towards Springer. We are therefore forced to the conclusion, either that the warning was not given, or that Forgy did not hear it. Second, Master Mechanic Gallinot testified that he visited crane No. 15 at about 3 o'clock and found that the work of removing the flues had been completed. He says he then told Forgy that he would go down at once and send up Springer with No. 17 to get No. 15 and take it to a

point where its flue chamber could be cleaned out with a hose. His testimony on that subject is as follows:

"I told Mr. Forgy that I would go right down and have Springer come up and get the crane and to watch out for crane No. 17; that he was coming in there after it to take it down to the river and wash the boiler out, and the three of us were standing right together on top of this boiler, and he says, 'All right.' And I says to Mr. Marshall, 'You go down and get the hose coupled up.' After I had given Mr. Forgy and Mr. Marshall their instructions, I stepped off the crane and walked down to the track, and then told Mr. Springer that I wanted that crane gotten and brought down to the river where I could wash it, as I was to put those tubes in that night and I wanted to get that crane finished up that night."

He further testifies that Springer promptly left to carry out his instructions.

These are some of the features in which the evidence is in conflict:

(a) Reed, a witness for the plaintiff, testified as follows in regard to Gallinot:

"Q. And did you see him around any place around No. 15 crane during the progress of repairs that Mr. Forgy was making on the day of his death? A. No, sir."

(b) Springer testified that Childers, the superintendent in charge of the work, rather than Gallinot, gave the directions to him to go after crane No. 15; that he had given the instruction repeatedly, and both he and Springer testified that considerable feeling had been developed because of Springer's failure to obey these instructions. Childers was afterwards fully examined as a witness, and did not explain this conflict.

(c) Another feature of the conflict is that Marshall, a witness much relied on by the defense, testified that Gallinot worked with him and Forgy in taking out the flues; that Gallinot did the work at the bottom end of the flues. Gallinot's testimony, on the other hand, clearly indicates that he had nothing to do with the removal of the flues. After a most careful reading of Gallinot's testimony, we are compelled to say that he was not a candid witness.

(d) Gallinot and Marshall testified that the work of taking out the flues had been fully completed something like an hour before the accident. Reed, on the contrary, testifies that Forgy, at the time of his death, was actually working on the flues, and all the circumstances go to support Reed's testimony.

During the day No. 17 had been passing back and forth at frequent intervals upon the same track upon which it passed prior to the accident. A considerable time had elapsed after the alleged conversation between Forgy and Gallinot, and the passing of No. 17. For this reason Forgy might have supposed that No. 17, on the occasion in question, instead of coming after 15, was going into the yards to get material as it had been doing on its previous trips.

In view of the conflicting state of the evidence, we think the question of the credibility of the entire body of witnesses was one for the jury, and that the trial court properly left to them the question of what, if any, warning was given to Forgy, and, if it was given, whether it was sufficient to constitute reasonable care.

[2] As a third defense the company urges that the negligence, if any, which caused Forgy's death, was the negligence of fellow servants. The men in charge of crane No. 17 were without doubt fellow servants of Forgy. If his death was caused by their negligence alone, the plaintiff cannot recover. On the other hand, if the death was caused by the joint negligence of the company and of these fellow servants, the company is liable. Kreigh v. Westinghouse Co., 214 U. S. 249, 257, 29 Sup. Ct. 619, 53 L. Ed. 984; Standard Oil Co. v. Brown, 218 U. S. 78, 85, 30 Sup. Ct. 669, 54 L. Ed. 939. We think there was evidence tending to show that the company failed to perform its duty. It took no measures whatever for Forgy's protection. We do not say that it was bound to adopt printed rules for the guidance of its employés, but we do say that it was bound to give specific directions that the car upon which Forgy was working should not be disturbed without warning him, and that it should have placed some warning upon the car to draw the attention of workmen clearly to the fact that it was undergoing repair. The danger was too great to leave the entire operation to the uncontrolled discretion of workmen.

We do not think the situation was one to which the rules developed by this court in American Bridge Co. v. Seeds, 144 Fed. 605, 75 C. C. A. 407, 11 L. R. A. (N. S.) 1041, and Kreigh v. Westinghouse, Church, Kerr & Co., 152 Fed. 120, 81 C. C. A. 338, 11 L. R. A. (N. S.) 684, are applicable. The facts of those cases were identical, and the latter case was reversed by the Supreme Court in 214 U. S. 249, 29 Sup. Ct. 619, 53 L. Ed. 984. Just how far their authority on the question of when a risk is one of "operation and not of construction" is impaired by the decision of the Supreme Court, is not now involved. That rule, however, is one which cannot be pressed too far without entirely exonerating the master from his duty to exercise reasonable care to furnish a safe place and safe methods of conducting his business. It is instructive that the rule was first developed in connection with scaffolding cases, and has had its most frequent application to actions of that character. It was first announced in New York, and was worked out by the courts of that state in great detail. What has happened to it there? As the result of many and appalling accidents, the Legislature has abrogated the rule, and in its place made the master not only liable civilly, but also made him liable as for a felony, whenever a scaffolding or other like structure gives way as the result of imperfect material or construction. The reports of commissions which led to this legislation point out the many accidents, and also show that the construction of scaffolding and other false-work in modern building operations often involves engineering judgment, and that the risks are so great that they cannot properly be left to the judgment of carpenters concerned only with particular features of the work. Certainly a master engaged on a great enterprise like that here involved, using agencies that are imminently dangerous to workmen, cannot say to its employés, "Here are safe railroads, safe cars, safe cranes, etc., now you use them so as not to injure each other," and thus absolve itself from all liability. To lay down any such a doctrine is to completely exonerate the employer from the

primary duty to exercise reasonable care to furnish workmen a reasonably safe place, and also exercise reasonable care as to methods of doing the work so as to safeguard workmen from unnecessary injury. Those duties are inalienable and continuous. B. & O. Ry. Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772; Kreigh v. Westinghouse Co., 214 U. S. 249, 29 Sup. Ct. 619, 53 L. Ed. 984.

[3] Is the action barred by limitation? The statute in Missouri limits actions of this character to three years from the time the cause of action arose. The accident occurred in March, 1911. An action was begun in May, 1911, in the circuit court of Jackson county, Mo. The plaintiff was nonsuited in June, 1913, and then brought the present action in May, 1914. That was within one year from the termination of the first suit, which is the time fixed by the local statute for renewing the litigation for the same cause after a dismissal or nonsuit. It is claimed that the first complaint was not upon the same cause of action upon which recovery is now sought; that in the first action there was no averment of a failure of the company in the performance of its duty as to a safe working place, or safe methods, but that the complaint proceeded exclusively upon the negligence of the company's employés in the operation of its cars; and that, as more than three years had elapsed when the present action was brought, the statute had run. The cause of action set up in both complaints is the death of Forgy by the wrongful act of the defendant. A mere amplification of the wrongful act, or a specification of the negligence with varying aspects, does not constitute a new cause of action, but simply an amplification of the same cause of action which would have been permitted by way of amendment of the original complaint upon application to the court. That being the case, the original action tolled the running of the statute. See Seaboard Air Line Ry. Co. v. Koennecke, 239 U. S. 352, 354, 36 Sup. Ct. 126, 60 L. Ed. 324; Seaboard Air Line Ry. v. Renn, 241 U. S. 290, 36 Sup. Ct. 567, 60 L. Ed. 1006; Crotty v. Chicago Great Western Ry. Co., 95 C. C. A. 91, 169 Fed. 593; First State Bank v. Haswell, 174 Fed. 209, 211, 98 C. C. A. 217.

The judgment is affirmed.

HOOK, Circuit Judge. I concur in the affirmance of the judgment, but desire to emphasize a feature of the case. The building of the bridge across the Missouri river was an undertaking of considerable magnitude that naturally required different gangs of men in different, and at times conflicting, activities. The work was even more hazardous to the employés than ordinary railroading. The place where Forgy was working was in all practical respects a repair track where men are not ordinarily expected to be on the lookout for violent entrance of other cars. Otherwise the duties put upon them could not well be performed. That an enterprise of such a character may be conducted by an employer without system, orders, or rules for the protection of his workmen, particularly those like Forgy, but that care for their safety may be left wholly to the judgment and discretion of their fellows in each emergency as it arises, does not commend itself to my judgment. It is customary in established hazard-

ous businesses for the employer to adopt and direct precautionary methods for that purpose, and there was no reason in the duration and character of the work why it should not have been done in this case.

Whether Forgy was notified is a question of fact that should not be affirmatively answered by us merely upon the testimony of a witness that happens to be without categorical contradiction. The truthfulness of his testimony should be weighed with the reasonable inferences from other facts and circumstances. The trial court with the witnesses before it thought the proofs made the question debatable, and the jury found Forgy was not notified. From the bare record here I think the finding probably right.

SANBORN, Circuit Judge (dissenting). It is conceded, and is indisputable, that the injury and death of Forgy was no evidence of the causal negligence of the construction company. It is conceded, and is indisputable, that Boone, the foreman, Forgy, the engineer, Reed and Jeffress, who worked with crane No. 15, Springer, the foreman, Lewis, the engineer, and Knowland and Garzee, who worked with crane No. 17, were fellow servants, and that the company is not liable on account of any negligence of any of them which caused or contributed to the injury or death of Forgy.

The burden was therefore upon the plaintiff below to prove by substantial evidence that the defendant was guilty of negligence which contributed to cause the injury and that such contributing negligence of the company was the proximate cause of the injury and death. The concurring negligence of others cannot transform a remote cause, or no cause, into a proximate cause. And where, at the close of the trial, there is no substantial evidence that the negligence of the defendant was the proximate cause of the injury, it is the duty of the court to instruct the jury to return a verdict for the defendant notwithstanding the fact that the negligence of others contributed to cause it. Cole v. German Savings & Loan Society, 124 Fed. 113, 116, 117, 59 C. C. A. 593, 596, 597, 63 L. R. A. 416; Atchison, Topeka & S. F. R. Co. v. Calhoun, 213 U. S. 1, 9, 10, 29 Sup. Ct. 321, 53 L. Ed. 671.

The only negligence of which it is claimed that the construction company was guilty was that it failed to give Forgy suitable warning that Springer was immediately coming with crane No. 17 to take crane No. 15 from the house track to the river, a distance of one-eighth to one-fourth of a mile, to enable the workmen to wash out the boiler. In the opinion of the majority this negligence consisted in a failure (1) "to give specific directions that the car upon which Forgy was working should not be disturbed without warning him," and a failure (2) "to have placed some warning upon the car to draw the attention of workmen clearly to the fact that it was undergoing repairs." As careful a perusal and analysis of the evidence in this case as it is possible for me to make has forced my mind to the conclusion that there was no substantial evidence of any causal negligence of the construction company before the jury at the close of the trial, and that the evidence is conclusive that if there was any causal negligence proved it was that of the deceased or his fellow servants.

1. The uncontradicted evidence, as I read the record, is that between 3 and 4 o'clock in the afternoon after Forgy and Marshall had completed the removal of the flues from the boiler and had done all the repair work intrusted to them which they could do at the place where the car stood, and immediately before Springer came up with crane No. 17 to take Forgy and crane No. 15 to the river, the master mechanic, Gallinot, and the assistant master mechanic, Marshall, notified Forgy that Springer would come up at once with crane No. 17 to take crane No. 15 to the river, Springer was immediately ordered to come and immediately came up with his crane and backed into crane No. 15 and the injury was inflicted. Springer and his crew knew that crane No. 15 was placed on the house track for repairs that morning, that Forgy was repairing it that day, and that Springer was to take it out from the house track to the river that the boiler might be washed out.

It is indisputable that, if these facts were established without substantial evidence to the contrary, the failure "to give specific directions that the car upon which Forgy was working should not be disturbed without warning him" could not have caused or directly contributed to cause his injury, because the warning actually given him superseded and made ineffective and immaterial instructions to warn and the absence of such instruction alike. He could not have been injured by a failure to warn him of what he had just been told and knew. And it is equally evident that the failure to place "some warning upon the car to draw the attention of workmen clearly to the fact that it was undergoing repair" could not have caused or directly contributed to cause the injury, because the testimony is positive and uncontradicted that Springer and the men on crane No. 17 knew that crane No. 15 and the three cars near it were placed on the house track in the morning of the day of the accident in order that crane No. 15 might be repaired, that they knew Forgy was repairing it there that day, that they knew as they went up there in the afternoon that they were going to take crane No. 15 from the track on which it was stationed, down to the river, and that as they went north, past the switch track which led into the house track in order to back in for the cars at No. 15, Springer and one of his crew saw Forgy sitting on the top of his cab with his feet down in the place whence the smokestack had been removed, and he turned, saw them, and grinned. This knowledge of Springer, and the men on No. 17 who backed into the three dead cars and pushed them against Forgy and No. 15, superseded and made ineffective and immaterial the presence or absence of "some warning upon the car to draw the attention of the workmen clearly to the fact that it was undergoing repairs." No such warning could have given them more complete knowledge of the material facts than they already had, and Forgy had just received through his notice of their coming.

Therefore the determining question is: Was the fact that Forgy was clearly notified of the coming of Springer and crane No. 17 to take his crane from the house track established by uncontradicted evidence, or was there substantial evidence that such notice was not given? To appreciate the testimony on this subject the nature and chronological order of the work which was being done that day must be in mind.

These facts were established without dispute. The job in hand was the construction of a bridge over the Missouri river. Childers was the superintendent, Gallinot was the master mechanic, Marshall was the assistant master mechanic, Boone was the foreman, and Forgy the engineer with crane No. 15. It was Forgy's duty to operate and repair the engine and crane. Boone, Reed, and Jeffress, who also worked with crane No. 15, took no part in the removal of the flues from the boiler, but discharged other duties including the removal of the headblock. The job of the day of the accident which concerns us was the repair of crane car No. 15. The work to be done in this repair in its order was: (1) To place No. 15 on the house track which extended west from the north and south tracks and was connected to them by a curved switch track. This house track was not in use for the passage of trains, engines, or cars generally and No. 15 was placed upon it for that reason. (2) To remove from the west end of No. 15 its broken headblock which weighed 4,500 pounds so that a new headblock could be put onto it. This work was among the duties of Boone, Reed, and Jeffress, and Forgy and Marshall took no part in it. (3) To cut out and remove the leaky flues in the boiler of crane No. 15 so that new flues could be inserted in it. (4) To take No. 15 from the house track to the river as soon as the old flues were removed from the boiler, a distance of an eighth to a quarter of a mile, and wash out its boiler before the new flues were inserted. (5) To insert the new flues, and (6) to put on the new headblock. Crane No. 15 was placed on the house track in the morning between 9 and 11 o'clock. Boone, Reed, and Jeffress then took the headblock from the crane car and finished that work a short time after dinner. They then left the crane and house track and spent the afternoon down to the river doing something, and were not there again until about five minutes before the accident, when Forgy was sitting on the top of the cab with his feet down in the place whence the smokestack was removed, and Springer and his crane and cars were going up north to back in to get the three dead cars and crane No. 15. Meanwhile Forgy and Marshall had been cutting the tubes out and had completed their work so that they had nothing more to do repairing the crane until the car was taken to the river where the boiler could be washed out. When they had completed the work of removing the tubes, they notified Gallinot, the master mechanic, and he examined the sheets of the boiler to see that they were not injured. Mr. Gallinot and Mr. Marshall testified that the removal of the flues and all the repair work that could be done by Forgy and Marshall before the crane car was moved to the river was then completed, and that thereupon they and Mr. Forgy were together on top of the boiler of No. 15. Mr. Gallinot testified that while they were there together he "told Mr. Forgy that he would go right down and have Springer come up and get that crane, to watch out for crane No. 17, that he was coming in there after him to take it down to the river to wash the boiler out," and that Forgy said, "All right," and Gallinot said to Marshall, "You go down and get the hose coupled up," that Gallinot then stepped off of the crane, walked down to the track, and told Springer he wanted crane No. 15 taken where he could wash it, that Springer said, "All right," and went up to get

it right away. Marshall, the assistant master mechanic, testified that he and Forgy cut the tubes out of the boiler that day, that he was sent up there after the steam and water had been taken out, about 11 or 11:30 in the forenoon, that they completed the work of cutting out the tubes about 3 in the afternoon, and then there was no more work they could do with the crane standing at that place, that thereafter Gallinot examined the sheets of the boiler where they cut the tubes out to see that they had not cut them up with the chisel, and when he had completed that examination he told Forgy that he would send Springer right up, to get him, and told Marshall to go down and get the hose ready and get it to the water plug, that he (Marshall) stayed there until Springer started up after the crane, that when he saw that Springer was at the north end of the switch that was down by the water plug coming up towards the north, he said to Forgy, "There comes Springer, I will go and get my hose out," and he jumped off the crane, that, when he left, Forgy was sitting on the top of the locomotive with his feet down in the smokestack and none of the other workmen were there, that the accident happened when he had walked about a quarter of a mile from crane No. 15. Three witnesses testify that one standing on the ground a step from the side of the crane car could have seen the cars attached to crane No. 17 with unobstructed vision when they came in on the house track to get the three dead cars and crane 15. Here then was the positive testimony of two witnesses that Forgy was notified immediately before the accident that Springer and his crane were coming in on the house track to get him and to watch for them. Was there any substantial evidence that this notice was not given?

It is said in the opinion of the majority that Reed testified that he did not see Gallinot any place around No. 15 crane during the progress of repairs that Forgy was making that day. But Reed also testified that he was not at or near the crane from shortly after dinner when he, Jeffress, and Boone finished removing the headblock until about five minutes before the accident, that they had been doing something down to the river during that time, and Gallinot and Marshall testified that it was during that time that they were at the crane with Forgy and notified him that Springer was coming with his crane to get crane No. 15 and that he (Forgy) must watch out for him. There was therefore nothing in the testimony of Reed in conflict or inconsistent with the testimony of Gallinot and Marshall that they gave Forgy notice of Springer's coming just before he started to get crane No. 15.

It is said in the opinion of the majority that Springer testified that Childers, the superintendent in charge of the work, rather than Gallinot, gave the directions to him to go after crane No. 15, that Childers had given the instructions repeatedly, and both he and Springer testified that considerable feeling had been developed because of Springer's failure to obey these instructions, and it is also said in the opinion that Childers was afterwards fully examined as a witness and "did not explain this conflict." But there was no conflict. Gallinot testified that he directed Springer to take his crane No. 17 and go up and get crane No. 15 and take it down to the river. Springer testified that Gallinot and Childers both directed him to do so at the same time,

at about 4 o'cock in the afternoon.   Here are extracts from his testimony that were nowhere contradicted:

"Q. What did Mr. Gallinot tell you when he was talking to you about it? A. He told me to get it down there so he could wash the boiler and put the flues in that night and we could work it the next day.  *  *  *  Q. And it was about 4 o'clock when Mr. Childers and Mr. Gallinot told you to go right down and get that crane and bring it down?  A. Yes sir."

Thus it appears that there was no feature of conflict between the testimony of Gallinot and Springer, and that there was nothing there inconsistent with the uncontradicted testimony of Gallinot and Marshall that they notified Forgy just before the accident that Springer was coming to take his crane and that he must watch for him.

In the opinion of the majority it is said that:

"Another feature of conflict is that Marshall, a witness much relied on by the defense, testified that Gallinot worked with him and Forgy in taking out the flues; that Gallinot did the work at the bottom end of the flues.   Gallinot's testimony, on the other hand, clearly indicates that he had nothing to do with the removal of the flues."

But (1) the fact that Gallinot did or did not have anything to do with the removal of the flues in no manner tends to conflict with the testimony of Gallinot and Marshall that they notified Forgy that Springer was coming with crane No. 17 to take him and No. 15 to the river just before Springer started and just after he started, and therefore it is immaterial; and (2) when all the testimony of Marshall and Gallinot on the subject of the latter's work is considered there is no conflict between them.   Marshall testified, as we have seen, that he and Forgy worked under the direction of Gallinot, that after he and Forgy finished removing the flues Gallinot examined the sheets, one of which was at the top and the other at the bottom of the boiler, to see whether they had cut them with their chisels, and that he then notified Forgy that he would go and send Springer and No. 17 to come and get No. 15, that he immediately did so, and Springer came right up and attached his crane to the three dead cars.   The only other testimony of Marshall on the subject of the doing of the work of repair was that Gallinot sent him up to help Forgy remove the tubes, about 11:30, and:

"Q. About what part of the crane did you go?  A. On top of the cab.   To get to the boiler you have to go in where the smokestack sets.  Q. Either on top of the boiler or inside?  A. That is where Mr. Forgy and I worked.   Mr. Gallinot had to come through the fire box to get inside.  Q.  The work you and Mr. Forgy were doing required you to be, as I understand it, either in the cab or on top of the cab?  A. Yes, sir.  *  *  *  Q. Go ahead and tell what you heard Mr. Gallinot say to Mr. Forgy.  A. Mr. Gallinot when we finished down in the boiler came up on top where we fellows was working, just after we finished.  *  *  *  Q. Now you were working there with Jack on this crane, you say?  A. Yes, sir.  Q. Helping him take out these flues, is that right?  A. Jack and I were both taking them out; yes, sir.  Q. And you were assistant master mechanic?  A. Yes, sir.  Q. And you were there doing the work of a laborer, is that right?  A. No, sir.  Q. That is not right?  A. No, sir; I didn't say that.  Q. Well, I understood you to say you were helping him take these flues out.  A. Jack and I were taking out flues together.  *  *  *  Q. Well, what tools—where were the tools, where did you put them after you got through with them?  A. The tools Mr. Gallinot had—Mr.

Gallinot worked in the bottom of the boiler. Q. Yes. A. And the tools he had, he left them in the ash pan."

This is all the testimony of Marshall as to the work Gallinot did on the crane. Gallinot testified:

"Q. Then after you got the crane up there on the track there under the bridge, the one we have called here the house track, who helped about that repair work? A. On the tubes Mr. Marshall, Tom Marshall helped Mr. Forgy. Q. Two of them worked on it, did they, that day? A. Two of them; both of them worked on the boiler or on the tubes, taking the tubes out. * * * Q. What did Mr. Forgy and Mr. Marshall do on that crane that day in the way of repairs? A. They cut these tubes out, cut them out and took the number of tubes that there was to be taken out, and then got this crane ready to go down to the river to have this boiler washed out before we put the new ones in."

This is all the testimony of Gallinot as to the work he did on the crane, except that he testified, as we have seen, that after Marshall and Forgy had finished their work of removing the tubes he examined the boiler to see that the sheets were not cut. Gallinot's testimony discloses his presence at the crane during the progress of the work and at and after its conclusion. In examining the sheets of the boiler it was necessary for him to go to and to examine the bottom sheet, and both witnesses testify that he made the examination. There is nothing in Marshall's testimony inconsistent with the theory that this was all he did at the bottom of the boiler, and there is nothing in Gallinot's testimony inconsistent with the theory that he also worked at the bottom of the boiler in taking out the tubes, the ash pan, the grates, or other parts it was necessary to remove. And so it is that when all their testimony is considered there is no conflict in the evidence of these witnesses upon this subject.

It is said in the opinion of the majority that:

"Gallinot and Marshall testified that the work of taking out the flues had been fully completed, something like an hour before the accident. Reed, on the contrary, testified that Forgy, at the time of his death, was actually working on the flues, and all the circumstances go to support Reed's testimony."

It is true that, after testifying that at the time of the accident he was about 15 feet south of the east end of crane 15, Reed testified on his direct examination in this way:

"Q. What was Mr. Forgy doing? A. He was taking flues out of No. 15 boiler. Q. How do you know he was taking flues out of the boiler? A. Because I saw him taking them out, working there with a hammer and chisel, and I was talking to him. Q. Now, how long before his death were you talking to him? A. About five minutes."

But upon further examination he testified:

"Q. You were standing 15 feet south of the east end of the crane? A. About 15 feet. Q. Of the east end of the crane that Jack Forgy had been working on that morning? A. Yes, sir. Q. What was Forgy doing on that crane? A. He had been taking out flues, he told me. Q. Taking out flues? And he had gotten those flues all out, hadn't he? A. I don't know whether he had or not. Q. Well, do you know whether he had or hadn't? A. No, sir. Q. Well, to the best of your knowledge he had them all out, hadn't he? The last hour before the time this accident happened, he hadn't taken any flues out, had he? A. I don't know, because I was not there. * * * Q. Then

where did you last see Jack Forgy just before the accident occurred? A. Sitting on top the cab with his feet down in the stack and I was talking to him. Q. And that is the last time you saw him, isn't it? A. That is the last time until I saw him in between the cars. Q. You didn't see him come down from the crane? A. No. Q. You didn't see him move from that position at all? A. No, sir; I turned and went after a piece of cable."

Thus Reed's testimony that when he talked with Forgy five minutes before his death the latter was taking flues out of No. 15 with a hammer and chisel was proved by his own testimony to be untrue. For he subsequently testified that he did not know whether or not the flues had all been taken out before that time, because he had not been there since just after dinner, and if he did not know that there were any flues in the boiler to be taken out he could not have known that Forgy was working taking them out. Moreover, Reed subsequently testified, not that Forgy was taking out tubes, when he last talked with him five minutes before the accident, but that he was sitting on the top of the cab with his feet down in the place for the smokestack, where, Marshall testified, he was sitting in idleness when he left him a few moments before to go after the hose, and where, Springer testified, he was sitting when he went north to back into the house track to get him. Reed also subsequently testified that, although there was a hammer and chisel by the ash pan, Forgy did not have them in his hands at the time of the accident, and he did not know whether or not Forgy took them down there, and Marshall testified that Gallinot's hammer and chisel were left in the ash pan. So it is that this testimony of Reed, when it is all taken together, is far from sufficient to create a conflict with the positive testimony of Gallinot and Marshall that the removal of the tubes, and all repair work that Forgy and Marshall had to do before the crane was taken to the river, was completed before the notice and the accident, and that they gave Forgy notice of the coming of Springer after the completion and just before the accident.

Nor do all the circumstances, or any of them, appear to me to support the first and mistaken statement of Reed that Forgy was taking out the tubes when he was injured, or five minutes before. Gallinot and Marshall testify that the tubes that were to be removed had all been removed before Gallinot notified Forgy of Springer's coming and left Forgy to go to tell Springer to come. The object of placing No. 15 on the house track was to have these tubes removed there before the boiler was taken to the river to be washed out. Gallinot ordered Springer to remove it to the river to enable him to wash the boiler out, and Springer had started to do so when the accident happened, and it is not probable that any such action would have been taken before the removal of the leaky flues was completed. Marshall testified that the tubes were removed, the notice given Forgy, and the latter was sitting on the top of the cab in idleness with his feet down in the place for the smokestack when he left him, which must have been a few moments before Reed, Boone, and Jeffress came back from their work down by the river, and Springer and Reed testified that he was still sitting there on the top of the cab five minutes before the accident when Reed last talked to him, and that Springer was going north to back in for him at that time. And Jeffress, who worked with Reed and Boone, tes-

tified that they sent him after a wrench shortly before the accident, that he found Forgy "standing in the crane, in the door, inside of the crane," and asked him for a wrench, that Forgy told him it was up on the front of the crane, that he went there to hunt for it, and while he was on the crane, and within a short time, a minute or two, after he had spoken to Forgy as he stood in the cab within the door, the accident happened.

A careful reading of all the testimony, and this review of all the evidence in the record relative to timely notice to Forgy that Springer was coming forthwith to take out his crane and to watch for him, seem to me to demonstrate the fact that there was no substantial evidence in conflict with the testimony of Gallinot and Marshall that all the work of removing the tubes and all the repairs of crane No. 15 that Forgy had to do on the house track had been completed before he (Gallinot) gave him the notice, that thereupon Gallinot notified him, in the presence of Marshall, that he would go down where Springer was, a distance of an eighth to a quarter of a mile, and direct him to come right up with his crane and take Forgy and his crane to the river, that he (Forgy) should watch out for Springer, that Gallinot immediately went to Springer and asked him to go up and get Forgy and his crane, and he (Springer) went forthwith, coupled onto the three dead cars east of No. 15, and the accident occurred. And because the uncontradicted evidence proved that Forgy was warned and knew of the immediate coming of Springer and his crane, and Springer and his crew knew that Forgy was on crane No. 15, and in this state of the case no alleged negligence of the company in failing to give warnings of that which these men knew could have been the proximate cause of Forgy's injury, I am unable to resist the conclusion that the court below should have directed a verdict for the company.

2. There is another reason why such a verdict should have been directed. The uncontradicted evidence is, as it seems to me, that Forgy was notified and knew of the coming of Springer when the latter started from his place by the river, that he was sitting on the top of his cab with his feet in the place of the smokestack when Marshall left him there alone and told him Springer had started after him, that a few minutes later, five minutes before the accident, as Springer came up past the curve, he was still sitting there as Reed and Springer testified, that he turned towards Springer and grinned, that three minutes later, within a short time, one or two minutes before the accident, Jeffress found him inside the cab in the door, that from one step to the side of the crane car his vision of Springer's train coming in on his track was unobstructed, and yet he went down upon the track between the cars and was injured. In my opinion this evidence conclusively proves contributory negligence on his part, and for that reason the company was entitled to a peremptory instruction in its favor.

3. If either of the conclusions which have been stated are correct, they dispose of this case, and the discussion and decision of other questions of fact or law herein are and will be obiter dicta, as I think they must be. But I do not wish by silence to seem to assent to the views concerning them expressed by the majority. They hold that "the rule in force on nearly all railroads in the United States for many years re-

quires that such a car (1) be protected by a blue flag by day and a blue light by night, (2) that only the workmen repairing the car can remove the warning," that the trial court "excluded evidence as to this rule," that the situation in this case was so nearly identical with that of a workman repairing a railroad car that such evidence might well have been received, and that this court may refer to and consider that rule of railroad companies in determining the question whether or not there was any substantial evidence of causal negligence of the defendant in this case at the close of the trial. I cannot bring myself to concur in any of these views. The majority concede that "there was no direct evidence in the trial court in relation to this rule," but assert that "it has been quoted in text-books and in countless judicial opinions." But text-books and countless judicial opinions were not offered in evidence in the court below to prove the rule, and if they had been they would have been incompetent for that purpose, would have been the mere hearsay statements of text-book writers of what they had read or heard, and the statements of judges of the substance of what witnesses had testified in the cases before them. Those witnesses were not before the court below, and no such rule was proved before or brought to the attention of the trial court, or to the attention of the defendant, and the defendant was given no opportunity to produce evidence to disprove its existence or its application. The record upon this subject is this: The plaintiff offered to show "that there was a general custom in vogue among railroad companies, and among employers whose business necessitated the use of cars and locomotives and heavy vehicles, to place a signal consisting of a blue flag either on the car that was being repaired, or about to be repaired, in order to protect workmen engaged in said repair." The defendant objected to the offer as immaterial. The court ruled that the plaintiff might prove such a custom among construction companies engaged in work similar to that of the defendant, but sustained the objection as to such custom among railroad companies. The plaintiff excepted, asked her witness if there was such a custom among construction companies, her witness answered, "No, sir," that testimony was corroborated by other witnesses, was never contradicted, and the foregoing is the only evidence or ruling relating to the rule on which the majority rely, or to this subject which the record contains.

Now, the question here is, not whether or not there can be found in the text-books or judicial opinions statements of facts which, if they had been proved in the court below, would have established the negligence of the defendant, but it is whether or not at the close of the trial when no one connected with the trial had proved such a rule, and the proof was plenary and undisputed that no such custom existed among construction companies, there was substantial evidence of the defendant's negligence. In view of the state of the record at the close of the trial, I cannot agree with the view that it is permissible for this court to import from text-books and opinions in other cases where other witnesses testified a rule prevailing among railroad companies not presented or proved in this case, and which the defendant had no chance to disprove, and then convict it of negligence for violating that rule. Moreover, if such a rule did in fact exist on railroads,

it is in my opinion immaterial in this case for two reasons: First, because the state of facts here proved was so radically different from that which ordinarily exists where a railroad car of a company engaged in general transportation is set upon one of its tracks in one of its railroad yards for repair. The defendant was not a railroad company. It was not engaged in the general transportation of freight or of passengers. It did not own or operate long lines of railroad over which transportation business was conducted through the yard in which this car was repaired. On the other hand, it was engaged in a local undertaking, in constructing a single bridge at a single place across the Missouri river. The track on which the crane car was placed was never in use for transportation of freight or passengers through the yard, but was used only for repairing cars and storing them. The employés of the defendant were few compared to those of a railroad company conducting general transportation. They were all working at and about the bridge and were familiar with every track the construction company had and the use of that track. They knew that the track on which the crane car was repaired was used, not for transportation, but for repairs and storage. On the other hand, a railroad company engaged in general transportation of freight and passengers has many employés who pass through one of its general yards, who come from distant places with engines and trains when they know little or nothing of the special uses of many tracks in the yards through which they pass, so that the rules or customs in such yards constitute no proper criterion of the reasonableness of rules or customs in a local construction yard; and, second, because the only usefulness such a rule could have had would have been to warn those who did not know the fact that they were approaching cars set on a track for repairs, or to warn those on the cars set for repairs of the approach of other cars or engines that might disturb those set for repairs, and where, as in this case, all the parties approaching and being approached had full notice and knowledge of the facts relative to the instant movements of the cars and engines, such a rule must have been useless and futile, and its existence or absence could not have been the cause of an injury or death which resulted, as the evidence conclusively proves this did, from the acts of fellow servants in operating their trains and doing their work after they had full notice and knowledge of the approach of the crane.

For the reason last stated, it was, in my opinion, likewise immaterial whether or not general rules or undisclosed precautionary methods, such as are referred to in the concurring opinion of Judge Hook, were adopted by the defendant. Their absence could not have been the cause of the injury or the death, because all the employés related to it had full notice and knowledge of everything such rules and methods could have brought to their attention.

Again, "The principle invoked, however, extends only to services of a complicated and dangerous character, requiring skill or experience. The details, even of dangerous business, and simple tasks as a whole, may be rightfully left to the common sense of the workmen." Wood v. Potlatch Lumber Co., 213 Fed. 591, 594, 130 C. C. A. 171, 174.

246 F.—14

The duty intrusted to the employés in this case was a simple and obvious one, such as their common sense would naturally induce them to discharge in safety. It was the simple duty of removing a car that had been under repair from a track in use for no other purpose than holding that car. No general rules or undisclosed precautionary methods could have better protected the employés than their own common sense and their full knowledge of their proposed movements. The simple business of constructing this bridge was not of such a complex and dangerous character as to require that it should be conducted on a system or scheme evidenced by a long list of general rules and specific methods prescribing such details as the ceremonies that must accompany the notice or warning the fellow servants should give each other of their proposed movements of cars repaired, especially where, as in this case, notice was fully and clearly given to each of them of the proposed movements of the cranes. "Unless the business be of such a complex and dangerous character as to require that it shall be conducted upon a system or scheme, in order to secure the orderly conduct of the business and the safety of those engaged in it, the master's obligation to supply a safe place for his work to be done, and to keep it safe, does not impose the duty of always keeping it in a safe condition so far as its safety depends upon the proper performance of the very work which his servants have there undertaken to do." Deye v. Lodge & Shipley Mach. Tool Co., 137 Fed. 480, 482, 70 C. C. A. 64, 66; Gulf Transit Co. v. Grande, 222 Fed. 817, 820, 138 C. C. A. 243, 246.

Finally, I am of the opinion that the rule that the duty of the employer is one of construction and provision, and the duty of the employés is one of operation and protection from negligent use, is applicable to this case, and that under it the negligence which caused the injury was conclusively proved to have been that of Forgy and his fellow servants, that it was negligence in operation and in protection against negligent use and not in construction or provision for which the construction company was not liable. The gist of this rule was early stated by Judge, afterwards Mr. Justice, Brewer in these words:

"The true idea is that the place and the instrument * * * must be safe, for this is what the master's duty * * * compels, and not that the master must see that no negligent handling by an employé shall create danger." Howard v. Denver & Rio Grande R. R. Co. (C. C.) 26 Fed. 837.

And it has been later stated and illustrated by the Supreme Court in Kreigh v. Westinghouse & Co., 214 U. S. 249, 257, 29 Sup. Ct. 619, 53 L. Ed. 984, and by this court in American Bridge Co. v. Seeds, 144 Fed. 605, 606, 611, 612, 75 C. C. A. 407, 408, 413, 414, 11 L. R. A. (N. S.) 1041, and many other cases.

In my opinion the case of Bridge Co. v. Seeds was not, as the majority seem to think, identical with Kreigh v. Westinghouse & Co. The former was a case of an injury whose sole proximate cause was the negligence of a superior fellow servant in giving a fatal signal in the doing of the work of the employés, and this court held that his act was a negligence of operation for which the employer was not liable and that there was no substantial evidence that the employer

was guilty of any negligence in the construction or equipment of the place or appliances that concurred with the negligence of the fellow servant. In Kreigh v. Westinghouse & Co. there were two charges of negligence, one of provision, the failure of the employer to provide a boom "with two ropes, one attached on either side of the end of the boom, to be used to haul it back and forth, and for the purpose of steadying its operation; or by the attachment of a lever to the mast in such a way that a man operating the lever could control the swing of the boom" (214 U. S. 254, 29 Sup. Ct. 621, 53 L. Ed. 984), which the Supreme Court held to be a negligence of provision for which the master might be liable (214 U. S. 257, 29 Sup. Ct. 619, 53 L. Ed. 984), and one of operation, the negligence of the servant in violently swinging the bucket against the plaintiff without signal or warning, which the Supreme Court held to be a negligence of operation, a negligence of the fellow servants of the plaintiff, for which the employer was not liable (214 U. S. 255, 257, 258, 29 Sup. Ct. 619, 53 L. Ed. 984). This court had held that the defendant was not liable for either act of negligence because the injury was not the natural or probable result of either and could not have been reasonably anticipated, because neither act of negligence was causal. Kreigh v. Westinghouse & Co., 152 Fed. 120, 122, 81 C. C. A. 338, 11 L. R. A. (N. S.) 684. The Supreme Court reversed the judgment solely because "the plaintiff's witnesses, experts in this field of operation, testified that the proper construction and management of such a derrick required that its boom should be rigged with two guy ropes instead of one, or that the mast should be provided with a lever by means of which the men in control could safely operate the boom," and it held that the failure to furnish the boom rigged with two ropes was a defect of construction and equipment. 214 U. S. 257, 29 Sup. Ct. 622, 53 L. Ed. 984. Answering the contention of the defendant that the injury was caused solely by the negligence of the employés in pushing the bucket violently against the plaintiff without warning or signal, it conceded that these acts were acts of negligent operation for which the employer was not liable, held that if these acts of negligence were the sole cause of the injury the plaintiff was not liable, but held that it was a question for the jury whether or not, under the particular evidence in that case, the defective construction and equipment of the boom directly contributed to the injury and concurred with that of the fellow servants. In the declaration of the law applicable to the case the Supreme Court was sedulous to distinguish liability for negligence of construction and provision for which the employer is liable, from liability for negligence of operation and for the negligent use of place and appliances by the fellow servants of the plaintiff. It said:

"The employé is not obliged to examine into the employer's methods of transacting his business, and he may assume, in the absence of notice to the contrary, that reasonable care will be used in furnishing appliances necessary to carrying on the business. Choctaw, Oklahoma, etc., R. Co. v. McDade, 191 U. S. 64, 68 [24 Sup. Ct. 24, 48 L. Ed. 96]. But while this duty is imposed upon the master, and he cannot delegate it to another and escape liability on his part, nevertheless the master is not held responsible for injuries resulting from the place becoming unsafe through the negligence of the workmen in the manner of carrying on the work, where he (the master) has

discharged his primary duty of providing a reasonably safe appliance and place for his employés to carry on the work, nor is he obliged to keep the place safe at every moment, so far as such safety depends on the due performance of the work by the servant and his fellow workmen. Armour v. Hahn, 111 U. S. 313, 4 Sup. Ct. 433, 28 L. Ed. 440; Perry v. Rogers, 157 N. Y. 251 [51 N. E. 1021]."

And it was after this declaration and in reference to this duty of construction and provision of reasonably safe appliances and place, and not with reference to liability for the operation of the work and the negligent use of this place and these appliances which might make the place, originally safe, dangerous, that this declaration cited in the opinion of the majority was made. "Where workmen are engaged in a business more or less dangerous, it is the duty of the master to exercise reasonable care for the safety of all his employés, and not to expose them to the danger of being hurt or injured by the use of a dangerous appliance or unsafe place to work, where it is only a matter of using due skill and care to make the place and appliances safe. There is no reason why an employé should be exposed to dangers un- necessary to the proper operation of the business of his employer. Choctaw, etc., R. Co. v. McDade, 191 U. S. 64, 66 [24 Sup. Ct. 24, 48 L. Ed. 96], and cases there cited."

As there was no negligence of the construction company in this case in the provision of a safe place and safe appliances to enable Forgy to do his work, and as the only causal negligence of which there is any evidence was negligence of Forgy and his fellow servants in the use and operation of this place and these appliances, it seems to me that under the established rule of liability for negligence in provision and liability for negligence in the use or operation of place and appliances, and the plain declaration and illustration of this rule in Kreigh's Case, the defendant should not have been held liable here, and the judgment ought to be reversed.